[No. D049198. Fourth Dist., Div. One. June 17, 2008.]

JOSHUA W. BRACK, Plaintiff and Appellant, v.
OMNI LOAN COMPANY, LTD., et al., Defendants and Respondents.

## COUNSEL

Majors & Fox, Frank J. Fox, Lawrence J. Salisbury, Steven T. Wlodek; Law Office of Mary A. Lehman and Mary A. Lehman for Plaintiff and Appellant.

Pillsbury, Winthrop, Shaw & Pittman, Richard M. Segal, Connie J. Wolfe; Diamond, McCarthy, Taylor, Finley & Lee, William T. Reid IV, Michael S. Truesdale and Lisa S. Tsai for Defendants and Respondents.

Edmund G. Brown, Jr., Attorney General, Tom Greene, Chief Assistant Attorney General, Albert Norman Shelden, Ronald A. Reiter, Kathrin Sears and Michele R. Van Gelderen, Deputy Attorneys General, as Amici Curiae.

## OPINION

**BENKE, Acting P. J.**—The principal defendant in this class action lawsuit, respondent Omni Loan Company, Ltd. (Omni),[1] a Nevada corporation, engaged in consumer lending in California. Although Omni's activities would otherwise be subject to the California Finance Lenders Law (Finance Lenders Law) (Fin. Code,[2] § 22000 et seq.), under choice-of-law provisions in Omni's loan agreements borrowers agreed Omni's loans would be governed by the law of Nevada. We conclude this choice of Nevada law is not enforceable.

In general, California courts will enforce a contractual choice of law if the state whose law was chosen has an interest in the parties' controversy. However, if application of the chosen law conflicts with a fundamental policy of this state, our courts must consider the impact application of the law will have on California's interests. If California's interests are materially greater than the interests of the state whose law was chosen by the parties, California will apply its law.

As we explain more fully below, here because application of Nevada law would conflict with fundamental California policy as manifested in the

---

[1] Omni Loan Company, Ltd., and Omni Financial Corporation were founded by Fred Nives, who was the principal shareholder of both corporations. All references to Omni include Omni Financial Corporation unless otherwise indicated.

[2] All further statutory references are to the Financial Code unless otherwise specified.

Finance Lenders Law and because California has a greater interest in the parties' transaction than Nevada, the parties' choice of law is not enforceable.

## FACTUAL AND PROCEDURAL BACKGROUND

Omni is a Nevada corporation with its principal place of business in Las Vegas, Nevada.[3] Omni is in the business of providing consumer loans to members of the military. Typically, Omni's loans are between $900 and $1,800, have repayment schedules of between nine and 18 months, and are funded by Omni on the same day Omni receives a borrower's application. In California, Omni's borrowers are nonresident members of the military, most of whom agree to repay their loans by way of deductions from their military paychecks. Omni's borrowers must also provide Omni with a security interest in personal property.

Commencing in July 1997 Omni attempted to obtain permission from the Commissioner of Corporations (the commissioner) to make loans in California to nonresident members of the military without complying with the requirements of the Finance Lenders Law. In seeking permission to make such loans, Omni relied on an early ruling the commissioner had provided to one of Omni's competitors, Pioneer Military Lending, Inc. (Pioneer). In 1996 Pioneer contacted the commissioner and described a loan program restricted to nonresident military personnel Pioneer planned to establish in California. Pioneer asked the commissioner for a ruling that its loan program was not subject to the Finance Lenders Law, and the commissioner provided it with such a ruling. In a letter to Pioneer, the commissioner stated "it is difficult to discern what the interest is of the State of California so as to require licensure of Pioneer under [Finance Lenders Law]." Thus, the commissioner advised Pioneer its loan program was not finance lending within the meaning of the Finance Lenders Law.

The commissioner declined to provide Omni with a ruling permitting it to operate its loan programs in California without a Finance Lenders Law license. In declining to grant Omni's request, the commissioner stated: "Omni's proposed lending activities are similar to Pioneer's, in that both lenders have represented to the Department that they will only be making loans to military personnel who are not residents of California. However, Omni appears to propose a greater business presence in California than Pioneer proposed to the Department. Pioneer represented to the Department that its loan paperwork would not be processed in California, and that the loans would be funded out-of-state. Thus, Pioneer represented that it would

---

[3] Omni Financial Corporation is headquartered in New Rochelle, New York, and provides a variety of management services to Omni Loan Company and its affiliates.

be making the loans from out-of-state to nonresidents stationed in California, and that its business activities within California would be minimal. Omni appears to propose a main California office to perform all functions related to making loans, and to further propose contracting with one to two independent contractors to facilitate the lending through the California main office. Omni is proposing to engage in more lending activities within the state of California than Pioneer, and is therefore more likely to be engaged in the business of a finance lender in California than Pioneer. In short, Omni has not chosen to structure its California lending activities in a manner identical to the Pioneer structure set forth in [the Pioneer letter]."

Omni challenged the commissioner's conclusion its business plan was materially different from Pioneer's. However, the commissioner declined to alter the Department of Corporations's determination: "As noted in [our earlier letter to you], the Department is unwilling to expand the reasoning in [the Pioneer letter] to include expanded business activity in California merely because the lending is to non-resident military personnel. Under the [Finance Lenders Law], California has a number of state interests in licensing finance lending activities beyond the protection of its citizens; therefore, any expansion of the business presence and business activities in California related to loans to non-resident military personnel could impact the state's interests and thus the Department would require licensure under the [Finance Lenders Law]."

Notwithstanding the commissioner's refusal to provide Omni with a ruling permitting it to operate in California without a license, in 2000 Omni opened a loan office in Oceanside, and in 2002 it opened another office in San Diego. In addition to the loan offices, Omni developed a retail partners program with California retailers by which Omni financed retail purchases by nonresident members of the military. Although Omni restricted lending from its California offices to nonresident members of the military, when California members of the military came into one of the Omni's offices, the California residents were directed to a computer terminal in the office and advised to go online and obtain financing through Omni's online affiliate, Militaryloans.com.

Plaintiff and appellant Joshua W. Brack was a nonresident member of the military stationed at Camp Pendleton. Brack initially applied electronically for a loan from Omni but was directed to complete his loan application at Omni's Oceanside office. Brack was not advised until he was presented with the loan agreement the interest rate would be 34.89 percent per annum. The loan was secured by Brack's personal property and included a $104.63 charge for property insurance and a prepaid finance charge. Like all of Omni's loans, Brack's loan agreement contained a choice-of-law provision, which stated: "You agree that this loan contract is subject to Nevada State law." Brack repaid his loan in October 2002.

In December 2003 Brack filed a class action lawsuit against Omni. Brack's principal allegation was that Omni's practices violated borrower's rights under the Finance Lenders Law. Brack alleged Omni's violations of the Finance Lenders Law gave rise to claims under the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.) and the unfair competition law (Bus. & Prof. Code, § 17200 et seq.) as well as under the Finance Lenders Law itself. Among other allegations, Brack alleged Omni was engaged in the business of a finance lender without obtaining a license from the commissioner and failed to prominently display in its offices a full and accurate schedule of its interest rate and other charges.

Omni answered the complaint and denied its material allegations. In addition, Omni asserted as an affirmative defense its contention that Brack's loan and all the loans of the putative class members contained a choice-of-law provision under which the borrowers agreed the loan would be governed by the law of Nevada. Omni also asserted Brack's claims were barred by the commerce clause of the United States Constitution.

Omni stipulated to class certification. The trial court then ordered trial of Omni's choice of law and commerce clause defenses be bifurcated from trial of Brack's affirmative claims. Omni's defenses were tried first by the court.

The trial court found Nevada had a substantial relationship to the loan agreements because Omni Loan Company, Ltd., was incorporated in Nevada and the loans were approved in Nevada. In its principal finding, the court determined California had no fundamental interest in the loan transactions that would require that its laws be applied in place of the law selected under the terms of the loan agreements. In reaching this conclusion, the trial court considered three circumstances. First, it looked to the fact that the department had permitted Pioneer to operate in California without a license and in many respects OMNI's activities were similar to what the department had authorized in its Pioneer letter. Second, the trial court found that, in any event, Omni's licensing status was strictly a regulatory matter and not a matter to be considered with respect to the enforceability of the choice-of-law provisions of Omni's loan agreements. Finally, aside from the requirement that finance lenders doing business here obtain a California license, the trial court found that the only difference between California and Nevada law which Brack established at trial was California's requirement that lenders post signs fully and accurately setting forth loan charges and the method of computing charges.

Although the trial court found California did not have a fundamental interest in applying its law, the trial court nonetheless found that because the loan agreements were made in California by consumers located here,

California had a materially greater interest in the loan transactions than Nevada. In light of California's interest in the transactions, the trial court rejected Omni's commerce clause defense. The trial court entered judgment in favor of Omni.

Shortly after the judgment was entered, the commissioner rescinded the Pioneer letter. In its rescission letter, the commissioner set forth a number of interests it believed California has in applying its laws to transactions involving nonresident members of the military. By its terms, the rescission letter had no impact on Pioneer's prior business practices in California. In light of the rescission, Brack moved to set aside the judgment on the grounds the trial court could no longer rely on the Pioneer letter. The trial court denied Brack's motion.

Brack filed a timely notice of appeal.[4]

## DISCUSSION

### I

#### *Standard of Review*

The interpretation of a choice-of-law provision on undisputed facts presents a purely legal question and is reviewed de novo. (*Hambrecht & Quist Venture Partners v. American Medical Internat., Inc.* (1995) 38 Cal.App.4th 1532, 1539, fn. 4 [46 Cal.Rptr.2d 33]; *American Home Assurance Co. v. Hagadorn* (1996) 48 Cal.App.4th 1898, 1907, fn. 6 [56 Cal.Rptr.2d 536].) Moreover, whether, on undisputed facts, the contractual choice-of-law provision supplants the law which would otherwise apply is also a question of law reviewed de novo. (See *Hughes Electronics Corp. v. Citibank Delaware* (2004) 120 Cal.App.4th 251, 257 [15 Cal.Rptr.3d 244].)

On the other hand, the trial court's resolution of disputed factual matters is subject to review under the substantial evidence standard. (*Integral Development Corp. v. Weissenbach* (2002) 99 Cal.App.4th 576, 585 [122 Cal.Rptr.2d 24].) Under this familiar standard, evidence must be reviewed in the light most favorable to the prevailing party, giving the benefit of any reasonable inferences and resolving all conflicts in favor of the trial court's finding. (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 461–462 [17 Cal.Rptr.3d 96].)

---

[4] Omni filed a notice of cross-appeal from that portion of the trial court's judgment which rejected its commerce clause defense. However, according to its respondent's brief, Omni has elected not to appeal the trial court's judgment.

## II

### Contractual Choice of Laws

#### A. Restatement Second of Conflict of Law Section 187

The parties largely agree the choice-of-law issue confronting us is governed by the holdings in *Nedlloyd Lines B.V. v. Superior Court* (1992) 3 Cal.4th 459, 464–469 [11 Cal.Rptr.2d 330, 834 P.2d 1148] (*Nedlloyd*), and *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 914–919 [103 Cal.Rptr.2d 320, 15 P.3d 1071] (*Washington Mutual*). In *Nedlloyd* a Hong Kong shipping company entered into a contract with three Dutch shipping companies. The contract contained a choice-of-law provision that required the contract be governed by Hong Kong law. When the Hong Kong company sued the other companies, it argued that notwithstanding the choice-of-law provision, its claims for breach of the covenant of good faith and fair dealing and breach of fiduciary duty should be governed by California law. In rejecting the Hong Kong company's contention and finding the choice-of-law provision enforceable, the court held that in determining the enforceability of the contractual choice-of-law provisions, "California courts shall apply the principles set forth in Restatement section 187, which reflects a strong policy favoring enforcement of such provisions.

"More specifically, Restatement section 187, subdivision (2) sets forth the following standards: 'The law of the state chosen by the parties to govern their contractual rights and duties will be applied, even if the particular issue is one which the parties could not have resolved by an explicit provision in their agreement directed to that issue, unless either [¶] (a) the chosen state has no substantial relationship to the parties or the transaction and there is no other reasonable basis for the parties choice, or [¶] (b) application of the law of the chosen state would be contrary to a fundamental policy of a state which has a materially greater interest than the chosen state in the determination of the particular issue and which, under the rule of § 188, would be the state of the applicable law in the absence of an effective choice of law by the parties.'

"Briefly restated, the proper approach under Restatement section 187, subdivision (2) is for the court first to determine either: (1) whether the chosen state has a substantial relationship to the parties or their transaction, or (2) whether there is any other reasonable basis for the parties' choice of law. If neither of these tests is met, that is the end of the inquiry, and the court need not enforce the parties' choice of law. If, however, either test is met, the court must next determine whether the chosen state's law is contrary to a *fundamental* policy of California. If there is no such conflict, the court shall

enforce the parties' choice of law. If, however, there is a fundamental conflict with California law, the court must then determine whether California has a 'materially greater interest than the chosen state in the determination of the particular issue . . . .' (Rest., § 187, subd. (2).) If California has a materially greater interest than the chosen state, the choice of law shall not be enforced, for the obvious reason that in such circumstance we will decline to enforce a law contrary to this state's fundamental policy." (*Nedlloyd, supra,* 3 Cal.4th at pp. 464–466, fns. omitted.)

Of some significance here, in discussing whether there was a conflict between the law chosen by the parties and a fundamental policy of California, the court stated: "We perceive no fundamental policy of California requiring the application of California law to Seawinds's claims based on the implied covenant of good faith and fair dealing. *The covenant is not a government regulatory policy designed to restrict freedom of contract, but an implied promise inserted in an agreement to carry out the presumed intentions of contracting parties.* [Citation.]" (*Nedlloyd, supra,* 3 Cal.4th at p. 468, italics added.)

In *Washington Mutual* the subject contracts were consumer loans which contained uniform preprinted choice-of-law provisions. The plaintiffs alleged the defendant bank acted unlawfully under California law in placing property insurance, and the trial court certified a nationwide class without determining what law would apply to their claims. Notwithstanding the substantially different contexts, the court in *Washington Mutual* found that, as in *Nedlloyd,* enforceability of the choice-of-law provisions was governed by section 187 of the Restatement Second of Conflict of Laws (Restatement). "Even though *Nedlloyd* was decided in the context of a negotiated arm's length transaction between sophisticated business entities, its analysis appears suitable for a broader range of contract transactions. California, we observe, has no public policy against the enforcement of choice-of-law provisions contained in contracts of adhesion where they are otherwise appropriate. [Citations.] More importantly, *Nedlloyd*'s analysis contains safeguards to protect contracting parties, including consumers, against choice-of-law agreements that are un-reasonable or in contravention of a fundamental California policy. [Citation.] Under *Nedlloyd,* which adopted the Restatement approach and found the enforceability of choice-of-law clauses closely related to that of forum-selection clauses [citation], the weaker party to an adhesion contract may seek to avoid enforcement of a choice-of-law provision therein by establish-ing that 'substantial injustice' would result from its enforcement (Rest., § 187, com. (b), p. 562) or that superior power was unfairly used in imposing the contract [citation]. In light of these protections, we conclude *Nedlloyd*'s analysis is properly applied in the context of consumer adhesion contracts." (*Washington Mutual, supra,* 24 Cal.4th at pp. 917–918, fn. omitted.) Thus the Supreme Court directed the certification order be vacated and the trial court

first consider what law would apply in light of the choice-of-law provisions in the class member's loan agreements.

### B. *States' Fundamental Policies*

Because the trial court's judgment was based on its determination that no fundamental policy of California required that California law be applied to Omni's loan agreements, we must of necessity carefully consider this aspect of section 187 of the Restatement.

■ To be fundamental, within the meaning of Restatement section 187, a policy must be a substantial one. (Rest., § 187, Restatement com. g, p. 568.) Thus "a policy of this sort will rarely be found in a reouirement, such as the statute of frauds, that relates to formalities . . . . Nor is such policy likely to be represented by a rule tending to become obsolete, such as a rule concerned with the capacity of married women . . . , or by general rules of contract law, such as those concerned with the need for consideration . . . ." (*Ibid.*) On the other hand the policy need not be as strong as is required when a state refuses to permit its courts to be used to prosecute a foreign cause of action. (Rest., § 187, com. g, p. 569.) In such cases, in which a state's obligations under the full faith and credit clause of the United States Constitution are implicated, the policy must involve " 'some fundamental principle of justice, some prevalent conception of morals, some deep-seated tradition of the commonweal.' " (Rest., § 90, com. c, p. 267.)

The relative significance of a particular policy or statutory scheme can be determined by considering whether parties may, by agreement, avoid the policy or statutory requirement. In *Hall v. Superior Court* (1983) 150 Cal.App.3d 411, 418–419 [197 Cal.Rptr. 757], the court found the express antiwaiver provisions in the Corporate Securities Law of 1968 (Corp. Code, § 25000 et seq.) prevented enforcement of choice of law and forum selection clauses in a contract for the sale of securities. The court stated: "California's policy to protect securities investors, without more, would probably justify denial of enforcement of the choice of forum provision, although a failure to do so might not constitute an abuse of discretion; but [Corporations Code] section 25701, which renders void any provision purporting to waive or evade the Corporate Securities Law, removes that discretion and compels denial of enforcement." (*Hall*, at p. 418.) Relying on *Hall v. Superior Court*, the court in *America Online, Inc. v. Superior Court* (2001) 90 Cal.App.4th 1, 15 [108 Cal.Rptr.2d 699], reached the same conclusion with respect to the antiwaiver provisions of the Consumers Legal Remedies Act (CLRA): "[E]nforcement of AOL's forum selection clause, which is also accompanied by a choice of law provision favoring Virginia, would necessitate a waiver of the statutory remedies of the CLRA, in violation of that law's antiwaiver

provision (Civ. Code, § 1751) and California public policy. For this reason alone, we affirm the trial court's ruling." (See also *Discover Bank v. Superior Court* (2005) 36 Cal.4th 148, 174 [30 Cal.Rptr.3d 76, 113 P.3d 1100].)[5]

Consistent with *Hall v. Superior Court* and *America Online, Inc. v. Superior Court*, the requirements of a statute may also be fundamental when the Legislature provides that an agreement entered into in violation of the statute is void. (See *Interinsurance Exch. v. Bailes* (1963) 219 Cal.App.2d 830, 836–837 [33 Cal.Rptr. 533]; Rest., § 187, com. g, p. 568 ["a fundamental policy may be embodied in a statute which makes one or more kinds of contracts illegal"].) When the Legislature acts in this manner, it is clear it has found the particular policies which underlie a statute are more important than the more general policy in favor of the freedom to contract. (See, e.g., *Application Group, Inc. v. Hunter Group, Inc.* (1998) 61 Cal.App.4th 881, 900–901 [72 Cal.Rptr.2d 73] (*Application Group*).)

The holding in *Application Group* is illustrative of the kind of policy which is fundamental within the meaning of section 187 of the Restatement. (*Application Group, supra*, 61 Cal.App.4th at pp. 899–901.) In *Application Group* the court considered an employment contract, which, by its terms, was governed by the law of Maryland. The contract contained a noncompetition clause, which, although lawful under Maryland law, violated the provisions of Business and Professions Code section 16600. The court found Business and Professions Code section 16600 reflected a fundamental policy within the meaning of section 187 of the Restatement such that it prevented use of the noncompetition clause in an action against an employee who had accepted a job from a California employer. (*Application Group, supra*, 61 Cal.App.4th at pp. 899–901.) " 'California courts have consistently declared this provision an expression of public policy to ensure that every citizen shall retain the right to pursue any lawful employment and enterprise of their choice. Section 16600 has specifically been held to invalidate employment contracts which prohibit an employee from working for a competitor when the employment has terminated, unless necessary to protect the employer's trade secrets. [Citation.] The corollary to this proposition is that [a competitor] may solicit another's employees if they do not use unlawful means or engage in acts of unfair competition.' [Citation.]" (*Id.* at p. 900.)

---

[5] We note many out-of-state cases have refused to enforce choice-of-law provisions because they would conflict with the antiwaiver provisions of applicable statutory schemes. (See *Cottman Transmission Systems, LLC v. Kershner* (E.D.Pa. 2007) 492 F.Supp.2d 461; *Volvo Const. Equip. North America v. CLM Equip.* (4th Cir. 2004) 386 F.3d 581, 607–610; *Cromeens, Holloman, Sibert, Inc. v. AB Volvo* (7th Cir. 2003) 349 F.3d 376, 391; *Wright-Moore Corp. v. Ricoh Corp.* (7th Cir. 1990) 908 F.2d 128, 132; *Pinnacle Pizza Co. v. Little Caesar Enterprises* (D.S.D. 2005) 395 F.Supp.2d 891, 898.)

## IV

Applying the foregoing principles to this record, we conclude the trial court erred in enforcing the choice-of-law provisions of Omni's loan agreements.

Admittedly, because Omni is a Nevada corporation, there is a substantial relationship with Nevada such that the choice of Nevada law in the loan agreements was reasonable. (See *Nedlloyd, supra,* 3 Cal.4th at p. 467.) Thus under section 187 of the Restatement we must next determine whether Nevada's law conflicts with the fundamental policy of California, and, if there is such a conflict, whether California has a materially greater interest in the transactions than Nevada. (3 Cal.4th at p. 467.) We find there is such a conflict and that California's interest in the loan agreements is greater than Nevada's.

### A. *Finance Lenders Law*

As we explain more fully below, in determining whether Nevada law conflicted with the fundamental policy of California, the trial court erred in its choice-of-law analysis. Rather than determining whether the application of the chosen state's law violated a fundamental policy of California, it isolated the difference between California's and Nevada's laws controlling finance lenders and then analyzed whether the isolated difference in the two states' laws—namely signage—was a fundamental policy. This approach led the trial court to consider each portion of the law separately and thereby minimize the impact of any deviation from the requirements of the law. As our analysis discloses, this approach was erroneous because it failed to consider the law as an integral whole, the particular parts of which reinforce each other.

In enacting the Finance Lenders Law, the Legislature directed that it "(a) . . . be liberally construed and applied to promote its underlying purposes and policies, which are:

"(1) To ensure an adequate supply of credit to borrowers in this state.

"(2) To simplify, clarify, and modernize the law governing loans made by finance lenders.

"(3) To foster competition among finance lenders.

"(4) To protect borrowers against unfair practices by some lenders, having due regard for the interests of legitimate and scrupulous lenders.

"(5) To permit and encourage the development of fair and economically sound lending practices.

"(6) To encourage and foster a sound economic climate in this state. . . ." (§ 22001.)

The expressly articulated policies set forth in section 22001—assuring an adequate supply of credit to consumers and protection of consumers from unfair practices—are on their face of some consequence. Here, in addition to the Legislature's statement of purposes, the remedies the Legislature has provided and the enforcement mechanism it has created make it clear not only that the requirements of the Finance Lenders Law are matters of fundamental public policy which cannot be waived by way of agreement between the parties, but that the provisions of the law must be viewed together.

■ We begin with section 22324, which states: "Any person who contracts for or negotiates in this state a loan to be made outside the state for the purpose of evading or avoiding the provisions of this division is subject to the provisions of this division." Section 22324, by expressly preventing parties from avoiding the strictures of the Finance Lenders Law by booking or otherwise making a loan out of state, strongly suggests the Finance Lenders Law may not be circumvented by a contractual choice-of-law provision.

The fundamental and unwaivable character of the Finance Lenders Law is also suggested in section 22750. Under section 22750 contracts made in willful violation of the Finance Lenders Law, including in particular violation of the requirement that a lender have a license issued by the commissioner, are void. If the violations are not willful, the lender must nonetheless forfeit any interest or charges. (§ 22752.) In addition, willful violations of the Finance Lenders Law are punishable with both civil and criminal penalties. (§§ 22713, 22753.)

Our conclusion that the provisions of the Finance Lenders Law are fundamental, unwaivable and integrated is buttressed by considering the licensing requirements of the law and the role licensing plays in enforcing the substantive provisions of the law. Section 22100 provides: "No person shall engage in the business of a finance lender or broker without obtaining a license from the commissioner." A finance lender is entitled to receive a license upon satisfying the commissioner that no one who has more than a 10 percent interest in the lender has been convicted of a crime or committed an act of dishonesty or fraud related to consumer lending. (§ 22109.) A licensee is required to make an annual report to the commissioner and maintain records of its transactions so the commissioner can determine whether the

licensee is complying with the Finance Lenders Law and regulations promulgated by the commissioner. The commissioner may revoke or suspend a license whenever, among other matters, the commissioner finds "[t]he licensee has violated any provision of this division or any rule or regulation made by the commissioner under and within the authority of this division." (§ 22714, subd. (a)(2).)

Significantly, the substantive and procedural obligations of the Finance Lenders Law are imposed on *licensees* and subject to enforcement by the commissioner. Under section 22150, "The commissioner may make general rules and regulations and specific rulings, demands, and findings for the enforcement of this division, in addition to, and within the general purposes of, this division." Section 22163 provides: "The commissioner may require that rates of charge, if stated by a licensee, be stated fully and clearly in the manner that the commissioner deems necessary to prevent misunderstanding by prospective borrowers." Section 22165 provides: "No advertising copy shall be used after its use has been disapproved by the commissioner and the licensee is notified in writing of the disapproval." Article 3 of the Finance Lenders Law, section 22300 et seq., imposes limitations on the conditions, rate of interest and charges *licensees* may impose on borrowers.[6] Finally, the commissioner is given the power to suspend or revoke any license if the commissioner finds: "The licensee has violated any provision of this division or any rule or regulation made by the commissioner under and within the authority of this division." (§ 22714, subd. (a)(2).) There would be little, if any, utility in establishing this thorough licensing scheme and giving the commissioner power over licensees, if the licensing requirements of the law and the power of the department could be waived by simple agreement between lender and borrower.

In sum, the Legislature, in expressly preventing any attempt to avoid its provisions by making loans outside the state, in voiding contracts made in violation of the Finance Lenders Law and in creating a licensing scheme through which it directly regulates the finance lenders market, has made it clear that the Finance Lenders Law is a matter of significant importance to the state and, like the provisions of Corporate Securities Law of 1968 and the CLRA, is fundamental and may not be waived. Just as importantly, it is obvious the statutory scheme, which depends upon both private remedies and administrative enforcement, is an integrated system of limitations and regulation which depend upon each other to achieve the overall goals of the

---

[6] Sections 22300, 22301, 22303, 22304, and 22305 limit the charges and interest *licensees* may receive for small loans. Section 22320.5 regulates the amount of late fees and delinquency fees a licensee may charge. Section 22334 regulates the maximum term of small loans. Section 22337 regulates the documentation licensees must provide when a loan is made and when it has been paid.

Legislature. Although the Finance Lenders Law does not contain an express antiwaiver provision, as did the statutes analyzed in *Hall v. Superior Court* and *America Online, Inc. v. Superior Court*, when the statutory scheme is reviewed as a whole, it is clear it represents a fundamental policy of this state.

■ Application of the choice-of-law provision in the Omni loan agreements would undermine the fundamental policy expressed in the Finance Lenders Law. Contrary to the findings of the trial court, the conflict between Nevada law and California law is far wider than simply differing standards as to signage. As we have seen, operation of the Finance Lenders Law depends in large measure upon private enforcement, licensing and the considerable power the commissioner exercises over licensees. The choice-of-law provisions in Omni's loan agreements immunized Omni's activities in this state from this entire regulatory scheme and thereby conflicted with it in a substantial manner.

### B. *California's Interest in Enforcing Its Law Is Greater Than Nevada's Interest in Enforcing Its Laws*

■ Importantly, we must recognize our analytical responsibility is not complete upon finding a conflict exists between a fundamental policy of California and the law selected by the parties. (Rest. § 187, subd. (2)(b).) Put more narrowly, a California consumer cannot avoid the obligations of a contract with an out-of-state business by simply arguing the transaction was covered by a California licensing and regulatory scheme. Under Restatement section 187, subdivision (2)(b), we must also determine whether California's interest in enforcing its law is greater than Nevada's interest in enforcing its laws. As the court in *Application Group, supra*, 61 Cal.App.4th at pages 898 to 899, stated: "[A] court can decline to enforce the parties' contractual choice-of-law provision only if the interests of the forum state are 'materially greater' than those of the chosen state, *and* the forum state's interests would be more seriously impaired by enforcement of the parties' contractual choice-of-law provision than would the interests of the chosen state by application of the law of the forum state." (Fn. omitted.)

The trial court found and the record shows that in the broadest sense California has a materially greater interest in Omni's loan transactions than Nevada. As the trial court noted, Omni's 12,000 California loans were made to California consumers, secured with collateral located in California, and provided cash that was likely spent in this state. Moreover, Omni's California competitors that are subject to California's regulatory scheme were deprived of the opportunity to make those 12,000 loans. Nevada's interest is limited to the out-of-state activities of one of its corporate citizens.

In this regard, we reject Omni's reliance on the Pioneer letters as governing California's interest in its loan activities. The most relevant aspect of the commissioner's administrative decisionmaking is the commissioner's dogged refusal to give Omni an interpretative opinion permitting it to operate in California without a license. To the extent the commissioner's opinion was relevant in determining California's interest in Omni's activities, the commissioner's views about *Omni's* activities are clearly entitled to far more weight than the commissioner's views about a third party. Of course, further undermining the value of the Pioneer letter as an expression of California's interest in loans to nonresident members of the military is the fact that the commissioner has abandoned the reasoning in that letter.

In any event, although relevant, the question we confront is more nuanced than simple consideration of which state has a greater economic interest in or connection to the parties' dispute. (See *Application Group, supra,* 61 Cal.App.4th at p. 903.) Rather, we must consider which state, in the circumstances presented, will suffer greater impairment of its policies if the other state's law is applied. (*Ibid.*)[7] Here, application of Nevada law would deprive a substantial segment of the borrowing public in this state of the substantive and regulatory protection California affords all of its other consumers. Nevada on the other hand has no policy which prevents its lenders from subjecting themselves to the regulatory authority of other states. That is to say, nothing in Nevada law prevented Omni from fully complying with California law. Rather, Nevada's interest in applying its law is limited to its more general interest in enforcing the provisions of contracts made by one of its citizens. Given these circumstances, application of Nevada law would impair California's regulatory interests to a far greater extent than application of California law would impair Nevada's interests.

In sum, although there was a reasonable basis for selecting Nevada law in the loan agreements, its application here conflicted with a fundamental policy of this state in circumstances in which California has a greater interest than Nevada. Hence the choice-of-law provisions of Omni's loan agreements are not enforceable here. (See *Nedlloyd, supra,* 3 Cal.4th at p. 465.) Thus we reverse the judgment of dismissal. Plaintiff may proceed with the lawsuit. In

[7] As the court in *Application Group* noted: "One of the difficulties in these cases is that the 'materially greater interest' test of subdivision (2)(b) of section 187 of the Restatement overlaps with the 'governmental interest' and 'comparative impairment' analyses that must be conducted in California to determine which state 'would be the state of the applicable law in the absence of an effective choice of law by the parties' [citation]. [None of the cases] disclosed by our research . . . discusses the relationship between and among these tests. The approach utilized by the Ninth Circuit for dealing with that problem . . . appears to have been to first examine the respective 'governmental interests' of the chosen and forum states and then determine the extent to which those interests would be impaired by application of the other state's laws. [Citation.]" (*Application Group, supra,* 61 Cal.App.4th at p. 898, fn. omitted.)

doing so, we express no opinion as to Omni's liability, if any, or any other affirmative defense Omni may assert.

## DISPOSITION

Judgment reversed.

Plaintiff to recover his costs of appeal.

Haller, J., and Irion, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 16, 2008, S166216.