[No. B216650. Second Dist., Div. Five. Jan. 27, 2011.]

JAMES L. BROWN, Plaintiff and Appellant, v.
MILTON C. GRIMES, Defendant and Respondent.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 8.1100 and 8.1110, this opinion is certified for publication with the exception of Discussion, part G.

COUNSEL

The Quisenberry Law Firm, John N. Quisenberry; Esner Chang & Ellis and Stuart B. Esner for Plaintiff and Appellant.

Munger, Tolles & Olson, Paul J. Watford and Jenny M. Jiang for Defendant and Respondent.

OPINION

MOSK, J.—

## INTRODUCTION

For the following three reasons, the trial court refused to enforce a fee-sharing agreement between lawyers—plaintiff James L. Brown and

defendant Milton C. Grimes—arising out of cases they handled in Texas: Brown had not performed his contractual responsibility to pay Paul Ross, a third party; Brown had unclean hands because he had unethically agreed to share his fees with Ross, a former lawyer who had resigned from the bar; and the fee-sharing agreement violated applicable Texas law because the clients did not consent to the arrangement at the outset of the litigation. The trial court also ordered Brown to return fees he had already received from Grimes under the fee-sharing agreement less an amount for the reasonable value of Brown's services. Brown does not challenge the sufficiency of the evidence supporting the trial court's factual conclusions.

We hold as follows: the trial court did not commit legal error in excusing Grimes from any further obligation to Brown under a fee-sharing agreement because of Brown's failure to perform one of his contractual obligations; the trial court erred in requiring Brown to repay monies already paid to him because there was not a total failure of consideration; the trial court erred in denying enforcement of the fee-sharing agreement under the unclean hands doctrine because Brown's offending conduct did not affect the fee-sharing agreement, was not inequitable as to Grimes, and did not prejudice Grimes; even if unclean hands applied, Grimes was not entitled to any affirmative relief; and a violation of the laws of either California or Texas governing fee-sharing agreements did not require Brown to repay money received from Grimes under the fee-sharing agreement.

## BACKGROUND

Ross, a former California attorney (who resigned as a result of State Bar proceedings against him), had been doing investigative work for a California attorney, Brown. Ross referred Brown cases of individuals injured by the 2005 British Petroleum (BP) refinery explosion in Texas City, Texas. As a result, Brown obtained signed retainer agreements with some of those individuals. But Brown told Ross that he, Brown, could not handle those cases as lead counsel because of other responsibilities.

Ross and Brown ultimately contacted Grimes, a California attorney, who agreed to act as lead counsel on the cases referred by Ross arising out of the BP explosion. Brown and Grimes entered into a written fee-sharing agreement, which provided as follows: "THIS CONSTITUTES THE AGREEMENT OF THE UNDERSIGNED REGARDING ASSOCIATION OF ATTORNEYS AND DIVISION OF ATTORNEYS' FEES pertaining to the British Petroleum ('BP') explosion cases, arising from the March 23, 2005 explosion at the BP facilities at or near Texas City, Texas. [Grimes], the lead litigation Attorney will receive fifty percent (50%) of all net attorneys' fees, and [Brown], the referring and associate attorney, will receive fifty percent

(50%) of all net attorneys' fees. This fee division will not in any way increase the total fees agreed upon by Clients in the Retainer Agreement and full disclosure of the attorney fee division has been made to Clients." There were spaces in the agreement for the clients to sign their consents, but no indication that they acknowledged or signed the agreement.

Brown referred a group of nine clients to Grimes. Ross referred the other clients directly to Grimes. Grimes ended up with a total of 53 BP explosion clients.

Brown testified at one point he was being compensated for his referrals and did not have to perform any legal services, but later added he was also to perform legal services. After first testifying that he was to be compensated for all the cases as the referring attorney, Brown later claimed he was the referring attorney on the first nine cases and was an associated attorney on the rest of them. Grimes testified he agreed to the 50/50 split with Brown of the contingent fee instead of agreeing to the customary 25 or 30 percent referral fee, because as part of the fee-sharing agreement, Brown orally agreed to pay Ross, the "project coordinator," out of Brown's 50 percent of the fees. Brown denied Grimes's account.

Grimes and Brown both were admitted to practice law in Texas *pro hac vice* as to the BP cases. Grimes promptly began working on the cases, and filed actions in Texas prior to obtaining from the clients signed consents to the fee-sharing agreement. Grimes had the clients sign a contingent fee agreement providing that he was to be paid a percentage of the recovery. Thereafter, clients signed an addendum acknowledging that Grimes was the lead attorney and that there would be a fee division with Brown, but the percentages of the division were not specified. Grimes said he did not consider the application of Texas requirements in connection with the fee-sharing agreement.

Grimes, with Brown's consent, brought in a Texas law firm, The Ammons Law Firm (Ammons firm), to act as local counsel in the cases. Grimes and Brown then agreed to modify the fee-sharing agreement to provide that Brown and Grimes would each be entitled to 40 percent of the fees and that the Ammons firm would be entitled to 20 percent of the fees. This modification did not purport to affect Brown's obligation to pay Ross. Grimes advised the clients of the involvement of the Ammons firm, and at some point, the clients signed documents reflecting that association and that the Ammons firm would receive 20 percent of the fee. Again, there was no breakdown as to the percentages of the contingency fee between Brown and Grimes. Brown did not participate in obtaining these consents.

As the arrangement developed, it was contemplated that Grimes would have the primary responsibility in dealing with the clients and trying the cases and would be paid the fees. Grimes would then pay certain expenses and have the contractual obligation to send Brown and the Ammons firm the amounts owed them. Brown was to compensate Ross out of the amount Brown received from Grimes. Brown's compensation was in large part for his referral of the clients, but also, in part, for whatever legal services he performed.

The relationship between Grimes and Ross deteriorated, precipitated in part by the association of the Ammons firm. In addition, according to Grimes, Ross was holding himself out as a lawyer. As a result, Grimes would no longer communicate with Ross. Grimes performed most of the legal services and considered Brown as essentially a referrer of clients.

Brown did perform what was described as some, but few, legal services and did not keep time records. According to Grimes, Ross acted as the "project coordinator," who performed "a lot of hours in these cases" in obtaining treating doctors for the clients, interviewing witnesses, and retaining experts.

Ross believed at the outset that Brown was to act for him in collecting Ross's share of the fees from Grimes, but Brown denied this assertion. Ross ultimately alleged that both Brown and Grimes agreed to pay Ross's compensation.

The BP cases began to settle. The first 13 settlements were funded, and Grimes, without Brown, met in Texas with each client whose case had settled to have the client sign papers reflecting the distributions to each of the attorneys and the client, and to give the settlement check to the client. As contemplated by the parties, Grimes, after receiving the distributions, sent Brown his 40 percent share of the fees—$1,342,000—for the cases then settled. Ultimately, Grimes had 27 of the 53 clients sign distribution breakdowns that showed the percentages received by each of the attorneys. At some point, after commencement of the Brown-Grimes dispute, Grimes had the remaining 26 clients sign consents and distribution sheets that did not include any reference to a distribution to Brown or even to Brown's name.

Grimes expected Brown to pay Ross out of the monies Brown received. Brown testified he thought Grimes was to pay Ross, and denied that he, Brown, had an agreement with Grimes to pay Ross. Grimes testified that notwithstanding his agreement with Brown that Brown pay Ross, Brown said he would not pay Ross. Grimes attempted to have Brown and Ross work out whatever amounts Brown should pay Ross. Ross rejected proposals from Grimes and Brown.

Ross first looked to Brown for payment, and when Brown failed to pay him, Ross claimed against both Brown and Grimes. Although denying that he could share attorney fees with Ross, Brown indicated he would pay Ross amounts owing to him upon submission of detailed invoices. When attempting to resolve the dispute between Ross and Brown, Grimes was informed that Brown had an agreement with Ross to give Ross 90 percent of the fees Brown received. Brown adamantly denied that any such agreement existed. Ross confirmed that he had an agreement with Brown that he, Ross, would be entitled to 90 percent of whatever Brown received from Grimes, and further asserted that Brown was to act for Ross in collecting Ross's fees, keeping 10 percent of them; but Ross also claimed his compensation was based on hours worked.

Ultimately, the settlements of the BP cases resulted in recoveries totaling approximately $38 million. Grimes offered to put Brown's remaining share of the fees from the settlements in Grimes's security account until Brown and Ross resolved their differences. But Brown demanded immediate payment of his share of the fees.

Ross had sent a letter to Grimes and Brown demanding $11,965,170, over twice the amount Grimes had received in fees at that point. Ross said that he had performed 8,785 hours of work and that Grimes agreed to pay him $850 per hour for his work as a consultant. Ross ultimately claimed an amount in quantum meruit based on an hourly rate of $1,362. Ross did not receive any monies from Brown. Grimes believed that Brown, by not paying Ross, breached the agreement Grimes had with Brown, and that explains why Grimes, for the second group of settlements, ceased including Brown's name on the list for distribution of fees and did not pay any further fees to Brown. Before litigation commenced, Brown had not satisfied or compensated Ross.

Brown sued Ross for declaratory relief seeking a declaration as to Brown's responsibilities to Ross. Brown later dismissed that action. Brown also sued Grimes for fees (with causes of action for breach of contract, conversion, breach of fiduciary duty, and accounting). Grimes cross-complained against Brown for rescission of their agreement and for the money previously paid Brown. Brown filed a petition for a writ of attachment. Pursuant to a stipulation, Grimes agreed to deposit $3,791,605.69—the 40 percent contingency amount claimed by Brown—plus interest, in a segregated account, and the amount was to be subject to an agreed writ of attachment in favor of Brown pending resolution of the litigation. In a separate action, Ross sued both Grimes and Brown, for, inter alia, services at the rate of $850 per hour, and Grimes and Brown cross-complained against each other for indemnity for the claims by Ross. The trial court consolidated the pending cases. During the proceedings, Ross and Grimes entered into a settlement under which Grimes

would pay Ross an amount up to $2.5 million out of the segregated account established by Grimes; the amount to be paid Ross was dependent on the outcome of the action between Grimes and Brown. If it was determined in the action that Grimes owed nothing to Brown, Ross would be entitled to the entire $2.5 million. If Brown had a recovery, Ross would recover a lesser percentage—or nothing at all—of the $2.5 million, which percentage would be based upon Brown's recovery.

In a pretrial in limine motion, the trial court ruled that Texas law governed the fee-sharing agreement between Grimes and Brown. Brown ultimately claimed $5,252,000 in damages for Grimes's alleged breach of contract. Following a bench trial, the trial court found Grimes's account of events more credible than Brown's and determined that the fee-sharing agreement between Grimes and Brown was unenforceable (and that Brown could not prevail on any of his claims) for three separate reasons. First, the trial court concluded that Grimes and Brown, as part of their fee-sharing agreement, agreed that Brown was obligated to pay Ross, that Brown and Ross had agreed Ross would receive 90 percent of whatever Brown received, and as Brown did not perform his obligation to Grimes to pay Ross, Brown could not enforce his fee-sharing agreement with Grimes. Second, the trial court found that Brown had unclean hands as a result of his fee-splitting agreement with Ross—a nonlawyer—which agreement the trial court said violated the California Rules of Professional Conduct and the Texas Disciplinary Rules of Professional Conduct. Thus, because of the unclean hands doctrine, the trial court determined that Brown could not enforce his agreement with Grimes. Third, the trial court held the fee-sharing agreement between Brown and Grimes unenforceable under Texas law because the terms of the agreement had not been disclosed properly to the clients as required by the applicable rules. On Grimes's cross-complaint, the trial court ordered Brown to return to Grimes the $1.4 million Grimes had already paid Brown under the fee-sharing agreement, less $400,000 in quantum meruit—the stipulated value of Brown's services. The trial court also concluded the settlement agreement between Ross and Grimes resolved Ross's claims against Brown.

The trial court entered judgment in favor of Grimes against Brown on Brown's complaint and on Grimes's cross-complaint, and in favor of Brown against Ross on Ross's complaint. All the other claims were deemed moot. Ross filed a dismissal of his action. After the entry of a judgment in favor of Grimes on Brown's complaint and on Grimes's cross-complaint, Brown filed a timely notice of appeal.

On appeal, Brown expressly does not challenge the sufficiency of the evidence supporting the trial court's findings of fact. He contends that the trial court erred for the following reasons: Brown was not required to pay

Ross and thus did not breach the fee-sharing agreement with Grimes, and in any event, any failure to pay Ross did not excuse Grimes from paying Brown; the unclean hands doctrine did not apply; Texas law did not govern the fee-sharing agreement with Grimes, and even if it did, the agreement complied with Texas law, as well as California law; and Brown was not obligated to repay Grimes the money he had received from Grimes.

## DISCUSSION

### A. *Standard of Review*

Questions of law are reviewed de novo. (*Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 800 [35 Cal.Rptr.2d 418, 883 P.2d 960].) Factual issues are reviewed under the substantial evidence test. (*Steiner v. Thexton* (2010) 48 Cal.4th 411, 417, fn. 7 [106 Cal.Rptr.3d 252, 226 P.3d 359]; *Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888–889 [264 Cal.Rptr. 139, 782 P.2d 278].) " 'Mixed questions of law and fact concern the application of the rule to the facts and the consequent determination whether the rule is satisfied. If the pertinent inquiry requires application of experience with human affairs, the question is predominantly factual and its determination is reviewed under the substantial-evidence test. If, by contrast, the inquiry requires a critical consideration, in a factual context, of legal principles and their underlying values, the question is predominantly legal and its determination is reviewed independently. [Citation.]' " (*Haworth v. Superior Court* (2010) 50 Cal.4th 372, 384 [112 Cal.Rptr.3d 853, 235 P.3d 152], quoting *Crocker National Bank v. City and County of San Francisco, supra*, 49 Cal.3d at p. 888; see *Ghirardo v. Antonioli, supra*, 8 Cal.4th at p. 800.)

The choice-of-law issue is a legal one that is decided de novo. (*Schoenberg v. Exportadora de Sal, S.A. de C.V.* (9th Cir. 1991) 930 F.2d 777, 783; *White v. ABCO Engineering Corp.* (2d Cir. 2000) 221 F.3d 293, 300; *Townsend v. Sears, Roebuck & Co.* (2007) 227 Ill.2d 147 [316 Ill.Dec. 505, 879 N.E.2d 893, 897]; *Edwards v. McKee* (2003) 2003 OKCIVAPP 59 [76 P.3d 73, 76]; cf. *Brack v. Omni Loan Co., Ltd.* (2008) 164 Cal.App.4th 1312, 1320 [80 Cal.Rptr.3d 275] [interpretation of choice-of-law provision and whether choice-of-law supplants otherwise applicable law are issues reviewed de novo].) Whether the unclean hands doctrine can be applied to a particular transaction is a legal issue reviewed de novo. (See *Jay Bharat Developers, Inc. v. Minidis* (2008) 167 Cal.App.4th 437, 445–446 [84 Cal.Rptr.3d 267] [" 'Whether the particular misconduct is a bar to the alleged claim for relief depends on (1) analogous case law, (2) the nature of the misconduct, and (3) the relationship of the misconduct to the claimed injuries.' "]; *Peregrine Funding, Inc. v. Sheppard Mullin Richter & Hampton*

*LLP* (2005) 133 Cal.App.4th 658, 680–681 [35 Cal.Rptr.3d 31].) Because we hold that the unclean hands doctrine is legally inapplicable, we do not have to decide the standard of review of an unclean hands determination if the doctrine could be applied. (Compare *Dickson, Carlson & Campillo v. Pole* (2000) 83 Cal.App.4th 436, 447 [99 Cal.Rptr.2d 678] [abuse of discretion] and *Lovett v. Carrasco* (1998) 63 Cal.App.4th 48, 55 [73 Cal.Rptr.2d 496] [abuse of discretion] with *California School Employees Assn., Tustin Chapter No. 450 v. Tustin Unified School Dist.* (2007) 148 Cal.App.4th 510, 521 [55 Cal.Rptr.3d 739] [substantial evidence], *In re Marriage of Dancy* (2000) 82 Cal.App.4th 1142, 1157 [98 Cal.Rptr.2d 775] [substantial evidence], superseded by statute on other grounds as stated in *In re Marriage of Fellows* (2006) 39 Cal.4th 179, 185, fn. 6 [46 Cal.Rptr.3d 49, 138 P.3d 200], *Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 [90 Cal.Rptr.2d 743] ["Whether the doctrine of unclean hands applies is a question of fact."], *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 620 [12 Cal.Rptr.2d 741] [question of fact] and *Insurance Co. of North America v. Liberty Mutual Ins. Co.* (1982) 128 Cal.App.3d 297, 306 [180 Cal.Rptr. 244] ["As a general rule, the application of the doctrine of unclean hands is primarily a question of fact."].)

### B. *Choice of Law*

 The parties and the trial court assumed that California law applies to the issues of the discharge of Grimes's contractual performance obligation, the application of the unclean hands doctrine, and restitution. This being so, we may apply California law to a determination of these issues. (See *Washington Mutual Bank v. Superior Court* (2001) 24 Cal.4th 906, 919 [103 Cal.Rptr.2d 320, 15 P.3d 1071] [" ' "[G]enerally speaking the forum will apply its own rule of decision unless a party litigant timely invokes the law of a foreign state." ' "].) Thus, even if Texas law applied to the issue of the validity of the Brown-Grimes fee-sharing agreement, the parties agreed to the applicability of depecage—i.e., the process of analyzing issues separately for choice-of-law purposes. (See *Washington Mutual Bank v. Superior Court, supra,* 24 Cal.4th at p. 920 ["a separate conflict of laws inquiry must be made with respect to each issue in the case . . ."]; see also *Beech Aircraft Corp. v. Superior Court* (1976) 61 Cal.App.3d 501, 519 [132 Cal.Rptr. 541].) Moreover, there does not appear to be any difference in the laws of Texas and California on the issues raised, other than the application of state attorney disciplinary provisions to the determination of the validity and enforceability

of the fee-sharing agreement and the effect of any such invalidity of the agreement.[1] As we discuss, we need not reach some of these latter choice-of-law issues.

### C. *Effect of Brown's Breach of Agreement*

#### (1) *Discharge of Grimes's Duty to Perform Based on Brown's Failure to Pay Ross*

Brown alleges that he is entitled to damages for Grimes's breach of contract in failing to pay Brown his share of the contingency fee.[2] The trial court found that the fee-sharing agreement between Grimes and Brown included as a "key term" Brown's oral promise to compensate Ross.[3] Brown's promise was a condition of Grimes's agreement to give Brown a higher percentage than is normally given to a referring attorney. The trial court further found that Brown breached his promise by not compensating Ross or acknowledging that he would compensate Ross, even after Grimes had sent to Brown $1,342,000 from fees received. The trial court therefore found that Brown's breach excused Grimes from further performance under the fee-sharing agreement.

Brown contends he did not breach any obligation to pay Ross because there was no showing as to the amount that was owed Ross, and any fee-sharing agreement between Brown and Ross, a nonlawyer, would be

---

[1] As to the validity and enforceability of the fee-sharing agreement and the effect of any such invalidity, the trial court determined that Texas law applies, using the "governmental interest analysis." (*Kearney v. Salomon Smith Barney, Inc.* (2006) 39 Cal.4th 95, 108–111 [45 Cal.Rptr.3d 730, 137 P.3d 914].) The parties also refer to the Restatement Second of Conflict of Laws (1971) section 188 (Contracts—"Law Governing in Absence of Effective Choice by the Parties"), and comment c to section 202, pages 645–647 (*"Existence and effect of illegality"*).

[2] Brown does not argue that he has some legal or equitable right in the specific fees paid by the clients. The clients paid Grimes, and Grimes was then to pay Brown an amount equivalent to 40 percent of the fees less expenses.

[3] Brown argues that Grimes never specifically pleaded this promise as part of the agreement and therefore cannot rely upon any such promise. Grimes did plead a general denial in his answer to Brown's complaint for breach of contract and added as one of the affirmative defenses that Brown's claim was barred by Brown's failure to perform his obligations. Grimes did not allege specifically the promise in the cross-complaint. Grimes, in his opening statement, asserted that Brown's failure to pay Ross excused Grimes's further performance. Under these circumstances, the lack of further specificity in the pleaded affirmative defense, even if that were a pleading defect, does not preclude the assertion of the defense. (See *Walsh v. West Valley Mission Community College Dist.* (1998) 66 Cal.App.4th 1532, 1545 [78 Cal.Rptr.2d 725] [general denial puts into issue all elements of a contract claim, including plaintiff's failure to perform]; *Lever v. Garoogian* (1974) 41 Cal.App.3d 37, 40 [115 Cal.Rptr. 856] [plaintiff had notice of defense]; see also *McClure v. Donovan* (1949) 33 Cal.2d 717, 729–730 [205 P.2d 17] [no objection to admission of evidence and no demurrer; thus waiver of pleading defect].)

invalid. Brown gave a number of other reasons why he felt he was justified in not paying Ross: he had no obligation to do so; Ross did not submit invoices; and Ross later demanded almost $12 million, more than Grimes had received. Regardless of the justification Brown gave for his acts or omissions, the trial court was unpersuaded. It found that Brown had an obligation to compensate Ross and did not pay anything or tender any amount to Ross. According to the trial court, Brown had the obligation to deal with and resolve any claim by Ross. In not doing so, Brown failed to fulfill his contractual obligations to Grimes. These are factual issues that the trial court resolved against Brown, and Brown does not challenge the sufficiency of the evidence supporting the findings.

■ When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract. (1 Witkin, Summary of Cal. Law (10th ed. 2005) Contracts, §§ 813, 814, p. 906 (Witkin) ["*Material* failure of consideration discharges the other party's duty ˙. . ."]; *De Burgh v. De Burgh* (1952) 39 Cal.2d 858, 863 [250 P.2d 598] ["in contract law a material breach excuses further performance by [an] innocent party"]; see *Sanchez v. County of San Bernardino* (2009) 176 Cal.App.4th 516, 529–530 [98 Cal.Rptr.3d 96]; *Wyler v. Feuer* (1978) 85 Cal.App.3d 392, 404 [149 Cal.Rptr. 626]; see also *Walker v. Harbor Business Blocks Co.* (1919) 181 Cal. 773, 778 [186 P. 356] [" 'failure . . . to perform an obligation . . . releases the obligee from the duty of making demand, and performance or tender, and justifies him in abandoning the contract . . .' "]; 15 Williston on Contracts (4th ed. 2000) § 44:46, pp. 200–201 (Williston) [when there are a number of performances for each party to the contract, a breach by a party of one, if material, allows the other party to treat the contract as discharged]; see also Civ. Code, § 1439 ["Before any party to an obligation can require another party to perform any act under it, he must fulfill all conditions precedent thereto imposed upon himself; and must be able and offer to fulfill all conditions concurrent so imposed upon him on the like fulfillment by the other party . . . ."].) Normally the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact. (See *Sanchez v. County of San Bernardino, supra*, 176 Cal.App.4th at pp. 529–530; *Superior Motels, Inc. v. Rinn Motor Hotels, Inc.* (1987) 195 Cal.App.3d 1032, 1051–1052 [241 Cal.Rptr. 487]; *Whitney Inv. Co. v. Westview Dev. Co.* (1969) 273 Cal.App.2d 594, 601 [78 Cal.Rptr. 302] ["Whether a breach is so material as to constitute cause for the injured party to terminate a contract is ordinarily a question for the trier of fact."]; *Wyler v. Feuer, supra*, 85 Cal.App.3d at p. 404; BAJI No. 10.82 (Spring 2010 ed.) p. 685; see also *Insurance Underwriters Clearing House, Inc. v. Natomas Co.* (1986) 184 Cal.App.3d 1520, 1526–1527 [228 Cal.Rptr. 449] ["Ordinarily the issue of materiality is a mixed question of law and fact, involving the application of a legal standard to a particular set of

facts. However, if reasonable minds cannot differ on the issue of materiality, the issue may be resolved as a matter of law."]; 23 Williston, *supra*, § 63:3, p. 440 ["The determination whether a material breach has occurred is generally a question of fact." (fn. omitted)].) Whether a partial breach of a contract is material depends on "the importance or seriousness thereof and the probability of the injured party getting substantial performance." (1 Witkin, *supra*, Contracts, § 852, pp. 938–940; see also *Superior Motels, Inc. v. Rinn Motor Hotels, Inc., supra*, 195 Cal.App.3d at p. 1051; *Sackett v. Spindler* (1967) 248 Cal.App.2d 220, 229 [56 Cal.Rptr. 435] [setting forth various factors as to materiality].) "A material breach of one aspect of a contract generally constitutes a material breach of the whole contract." (23 Williston, *supra*, § 63:3, p. 440, fns. omitted.)

Even though Brown does not challenge the sufficiency of the evidence supporting the trial court's implied finding that Brown materially breached the fee-sharing agreement thereby excusing Grimes's performance,[4] we note that there is substantial evidence to support the trial court's finding. Ross asserted he was entitled to substantial compensation. Grimes said that he agreed to provide Brown with a much higher percentage of the fees on the condition that Brown compensate Ross. The trial court found that Brown's promise to compensate Ross was a "key" term of the fee-sharing agreement. Brown refused to pay Ross and denied that he, Brown, had a 90/10 fee-splitting agreement with Ross. When Grimes suggested putting fees in an account, Brown demanded immediate payment. Grimes's efforts to have Brown and Ross reach an agreement on compensation were to no avail. By the time Ross sued Grimes, Brown had not paid anything to Ross. If Grimes paid Brown money and Brown did not satisfy Ross, Grimes risked that Ross would claim a portion of that money from Grimes. And with the advent of litigation, Grimes faced legal expenses.

Brown contends that his failure to compensate Ross, even if a breach of the fee-sharing agreement, should only result in his paying damages to Grimes and not in excusing Grimes from Grimes's obligation to pay Brown. Otherwise, Brown argues, he would be subjected to a forfeiture. Brown's argument assumes, inter alia, that his obligation is based on a promise or covenant independent of Grimes's promise to Brown. (See *Fresno Canal & Irrigation Co. v. Perrin* (1915) 170 Cal. 411, 415–416 [149 P. 805]; *Verdier v. Verdier* (1955) 133 Cal.App.2d 325, 334 [284 P.2d 94]; 1 Witkin, *supra*, Contracts,

---

[4] The doctrine of implied findings of fact "directs the appellate court to presume that the trial court made all factual findings necessary to support the judgment so long as substantial evidence supports those findings and . . . applies unless the omissions and ambiguities in the statement of decision are brought to the attention of the superior court in a timely manner. [Citations.]" (*SFPP v. Burlington Northern & Santa Fe Ry. Co.* (2004) 121 Cal.App.4th 452, 462 [17 Cal.Rptr.3d 96]; see *Fladeboe v. American Isuzu Motors Inc.* (2007) 150 Cal.App.4th 42, 58 [58 Cal.Rptr.3d 225].)

§§ 810–812, pp. 902–906; 15 Williston, *supra*, § 44:6, pp. 92–94.) Brown did not make such a contention before the trial court. He argued he made no such promise at all. Although during the trial court proceedings, Grimes entered into a settlement agreement with Ross, the terms of that settlement are not determinative of Grimes's damages for Brown's breach of the agreement, for Grimes had to expend attorney fees in connection with Ross's claims, and the amount payable to Ross was subject to the outcome of Brown's claim against Grimes. Moreover, the issue was whether Brown's breach relieved Grimes of his obligation, not what occurred during litigation. (See Rest.2d Contracts, § 237, com. a, pp. 215–216, § 242.)

█ The determination of whether a promise is an independent covenant, so that breach of that promise by one party does not excuse performance by the other party, is based on the intention of the parties as deduced from the agreement. (15 Williston, *supra*, § 44:7, pp. 94–96.) The trial court relied upon parol evidence to determine the content and interpretation of the fee-sharing agreement between the parties. Accordingly, that determination is a question of fact that must be upheld if based on substantial evidence. (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165–1166 [6 Cal.Rptr.2d 554].) By excusing Grimes's performance, the trial court found that the promises by Brown and Grimes were not independent, and Brown does not challenge the sufficiency of the evidence to support this finding. Moreover, it would seem unlikely that the parties intended that Grimes would have to continue to pay Brown if Grimes remained vulnerable to claims of Ross that Brown was obligated to satisfy. Brown would necessarily be required to fulfill his promise to pay Ross each time Grimes had to pay Brown based on fees Grimes periodically received. Brown, in effect, had repudiated his obligation to pay Ross at the time he was demanding payment from Grimes. Whether Brown's promise to compensate Ross is viewed as a condition or a dependent covenant or promise (see Witkin, *supra*, Contracts, § 778, pp. 867–868 & § 811, pp. 903–905; 8 Corbin on Contracts (rev. ed. 1999) § 30.12, pp. 22–27; Rest.2d Contracts, § 237 & com. b, pp. 217–218), the trial court did not err in finding that the breach of that promise excused Grimes from further performance of the fee-sharing agreement.[5]

In a related argument, Brown cites *Ferelli v. Weaver* (1962) 210 Cal.App.2d 108, 114 [26 Cal.Rptr. 439], which dealt with a claim by a contractor against an owner for completed construction work and the cross-complaint by the owner against the contractor for admittedly failing to pay subcontractors and not having subcontractor liens removed from the owner's property. In that case, the trial court deferred judgment until the contractor paid the subcontractors. The Court of Appeal affirmed, saying that the contractor's failure to pay the subcontractors gave the owner a right to offset those amounts, but did

---

[5] Brown has not contended that the trial court failed to deal explicitly with his tort claims.

not result in a forfeiture of all payments owing to the contractor. The court cited Code of Civil Procedure section 1186.1 (since repealed) that dealt with a situation in which a general contractor hired by a property owner failed to pay subcontractors on the job and the subcontractors thereafter filed liens on the owner's property. Moreover, the owner did not argue that the contractor's breach excused the owner's performance. The owner asserted other defenses. Thus, that case is distinguishable from the instant case.

■ Brown also invokes Restatement Second of Contracts, section 240, which provides, "If the performances to be exchanged under an exchange of promises can be apportioned into corresponding pairs of part performances so that the parts of each pair are properly regarded as agreed equivalents, a party's performance on his part of such a pair has the same effect on the other's duties to render performance of the agreed equivalent as it would have if only that pair of performances had been promised." (See 13 Corbin on Contracts (rev. ed. 2003) § 68.4(3)(b), pp. 198–201.) ■ Section 240, comment a of the Restatement Second of Contracts on page 229 provides, "a party's failure to perform may cause him to lose his right to the agreed exchange after he has relied substantially on the expectation of that exchange, as by either preparation or performance. The risk of forfeiture is similar to that which arises on the non-occurrence of a condition stated in the agreement. . . . But because the failure must be material in order to have this effect . . . courts can temper the application of those sections in appropriate cases to avoid forfeiture in a way that is not possible where the agreement itself states the condition. . . . In addition, forfeiture may sometimes be reduced or avoided by allowing a party whose failure has been material to have restitution in accordance with the policy favoring avoidance of unjust enrichment." (Citations omitted.)

This is not a case of "agreed equivalents," "as if the parties had made a separate contract with regard to that pair of corresponding parts." (Rest.2d Contracts, § 240, com. a, p. 229.) Moreover, in effect, Brown is receiving what exceeds what would be analogous to restitution, for he will end up with $1,342,000, substantially more than the $400,000 quantum meruit that the trial court awarded him for his services. The trial court noted that Brown did not present any evidence that the value of his services exceeded $400,000.

### (2) *Brown Has No Obligation to Repay Grimes*

■ That Brown cannot enforce the fee-sharing agreement because of his failure to perform all of his contractual obligations does not mean that he

must repay the monies he received from Grimes under the agreement.[6] A party is entitled to restitution when the contract has failed, such as when it is void, or has been rescinded or *"the consideration has wholly failed."* (1 Witkin, *supra*, Contracts, § 1042, pp. 1132–1133.) Thus, a failure of performance generally gives rise to a claim for restitution of money had and received only when there has been a total breach—i.e., total failure of consideration or repudiation. (*Gaffey v. Welk* (1920) 46 Cal.App. 385, 389–390 [189 P. 300]; see *Richter v. Union Land & Stock Co.* (1900) 129 Cal. 367, 373 [62 P. 39]; 3 Dobbs, Law of Remedies (2d ed. 1993) § 12.7(1), fn. 18(1), p. 794 ["More commonly, a restitutionary recovery is merely an alternative remedy for total or substantial breach of contract . . . . A partial breach will not normally suffice"]; Calamari & Perillo on Contracts (6th ed. 2009) § 15.3, p. 542 ["Restitution is available as a remedy for total breach only, not for a partial breach . . . the non-breaching party must elect to cancel the contract"]; Rest.2d Contracts, § 373; 13 Corbin on Contracts, *supra*, § 68.5(2), p. 216.)

Grimes has received consideration—the referral of cases from which he has earned millions of dollars. Brown partially breached the agreement by not paying Ross; the trial court did not find that Brown breached the agreement in connection with the referral of clients or legal services rendered by Brown. Although Brown's breach is material, there is no finding that Brown's failure to pay Ross constituted a total or even substantial breach of the fee-sharing agreement.

The fee-sharing agreement has not been rescinded. Although Grimes pleaded a claim for rescission, he did not plead or prove that he offered to restore that which he had received. (Civ. Code, § 1691, subd. (b).)

The trial court's theory that Brown's breach of agreement excused performance does not result in restitution on any other ground. The trial court's breach of contract theory does not involve invalidity of the agreement. Also, Brown's nonperformance, although material, does not go to the essence of the contract—the referral of cases. Restitution would bear no relationship to restoring Grimes to his position before the contract was made (see *Crofoot Lumber, Inc. v. Thompson* (1958) 163 Cal.App.2d 324 [329 P.2d 302]) and would provide Grimes with an added windfall. He would receive substantially more than he bargained for. Although the fees came from the clients, Brown, who had fee agreements with clients, referred his clients to Grimes, and provided the contingent fee opportunity to Grimes. Brown bestowed upon Grimes consideration that cannot be restored to Brown. Accordingly,

---

[6] Because we conclude that Grimes does not prevail on his cross-complaint, we do not reach Brown's contention that Grimes could not recover under his cross-complaint because of defects and omissions in Grimes's pleading.

there is no basis to conclude that Brown completely or substantially failed to perform the contract so that Grimes could recover the amount he already paid Brown.

■ In addition, Grimes has not cross-claimed for damages for breach of contract or sought to prove actual damages. His claim for money had and received is likewise to no avail. An action for money had and received will only lie when there is "a total failure of consideration . . . . Assuming that an action for money had and received will also lie in case of a partial failure of consideration, this would be true only where the partial failure is as to a precise and definite part which is capable of being ascertained by computation." (*Mauss v. Kato* (1931) 117 Cal.App. 663, 665 [4 P.2d 179]; see *Melicharek v. Colkins* (1919) 42 Cal.App. 148, 150 [183 P. 457] [no right to money had and received because not total failure of consideration]; see also *Hayes v. County of Los Angeles* (1893) 99 Cal. 74, 79 [33 P. 766] ["consideration wholly fails . . ."]; *De Bakcsy v. Strain* (1923) 61 Cal.App. 518, 522 [215 P. 105] [claim for money had and received when total failure of consideration for executory contract].)[7] Here, the amount Grimes paid Brown bears no relationship to any damage Grimes suffered by Brown's failure to perform his obligation to pay Ross, and any damage suffered by Grimes is not sufficiently precise or definite. Thus, there is no basis for a recovery under a common count claim.

### D. *Unclean Hands*

■ The trial court found that Brown's hands were unclean because of his fee-sharing agreement with Ross, a nonlawyer,[8] and therefore that Brown could not enforce his agreement with Grimes. "The [unclean hands] doctrine demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim." (*Kendall-Jackson Winery, Ltd. v. Superior Court, supra,* 76 Cal.App.4th at p. 978.)

■ The unclean hands doctrine is inapplicable for a number of reasons. To deny relief to a party under the unclean hands doctrine, the improper conduct must be "in the particular transaction or connected with the subject matter of the litigation that is a defense." (13 Witkin, *supra,* Equity, § 13, pp. 297–298, citing *Soon v. Beckman* (1965) 234 Cal.App.2d 33 [44 Cal.Rptr. 190]; see *O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1060 [9 Cal.Rptr.3d 286] [The unclean hands doctrine does not apply if the inequitable conduct did not occur in the transaction to which the relief sought

---

[7] King, The Use of the Common Counts in California (1941) 14 So.Cal. L.Rev. 288, 299 (There must be "a total failure of consideration.") (capitalization omitted).

[8] See *McIntosh v. Mills* (2004) 121 Cal.App.4th 333, 344 [17 Cal.Rptr.3d 66].

relates.]; *Blain v. Doctor's Co.* (1990) 222 Cal.App.3d 1048, 1060 [272 Cal.Rptr. 250]; 2 Schwing, Cal. Affirmative Defenses (2010) § 45:3, p. 1259 (Schwing) ["The party against whom the unclean hands doctrine is invoked must have 'directly infected' the actual cause of action before the court . . . ."].) "If he [the wrongdoer] is not guilty of inequitable conduct toward the defendant in that transaction, his hands are as clean as the court can require." (2 Pomeroy, A Treatise on Equity Jurisprudence (5th ed. 1941) § 399, p. 97; see *Bradley Co. v. Bradley* (1913) 165 Cal. 237, 242 [131 P. 750] [citing *Pomeroy* and stating, "His misconduct must be so intimately connected to the injury of another with the matter for which he seeks relief, as to make it inequitable to accord him such relief."].)

Although Brown's agreement with Ross to pay Ross from Brown's share of the fees is related to the transaction in issue, such a relationship is attenuated. The amount of compensation under the Grimes-Brown fee-sharing agreement is unaffected by the offending agreement between Brown and Ross. The unclean hands emanating from the Brown-Ross agreement did not directly affect or infect the relationship between Grimes and Brown and, most importantly, was not inequitable conduct towards Grimes. (See *Unilogic, Inc. v. Burroughs Corp., supra*, 10 Cal.App.4th at p. 621 [unclean hands applicable if it " 'affects the equitable relationship between the litigants' "]; *Moriarty v. Carlson* (1960) 184 Cal.App.2d 51, 57 [7 Cal.Rptr. 282] ["The misconduct must infect the cause of action before the court."].) Grimes had no interest in how Brown fulfilled his promise to compensate Ross. Brown had an obligation to take care of Ross's claims for compensation, and that obligation did not have to be fulfilled by the alleged fee-splitting arrangement. Thus, there is no connection between the offending Brown-Ross agreement and the amount Brown claims from Grimes. The unenforceability of the Brown-Ross agreement affects only the relationship between Brown and Ross. (*Kendall-Jackson Winery, Ltd. v. Superior Court, supra*, 76 Cal.App.4th at p. 985.)

Brown may be seeking a benefit as a result of his improper fee-splitting agreement with Ross (Rules Prof. Conduct, rule 1-320(A); Tex. Disciplinary Rules Prof. Conduct, rule 5.04(a)) or by the way Ross obtained clients (see Bus. & Prof. Code, § 6152 [prohibits person from acting "as a runner or capper for any attorneys"]), but the illegality of the Brown-Ross agreement or of Ross's activities did not directly affect the Grimes-Brown agreement or make it illegal or otherwise unenforceable.

Even if there is a relationship between the agreements, it would not be inequitable to enforce the Grimes-Brown agreement notwithstanding the Brown-Ross agreement. Grimes knew of Ross's activities and that Ross was to be compensated, and Grimes knew about the 90/10 fee split between Ross

and Brown before he received much of his compensation. He was not adversely affected by the nature of the Brown-Ross agreement.

No action constituting unclean hands was directed at Grimes or prejudiced Grimes. (See *Jay Bharat Developers, Inc. v. Minidis, supra,* 167 Cal.App.4th at p. 445, quoting *Kendall-Jackson Winery, Ltd. v. Superior Court, supra,* 76 Cal.App.4th at p. 979 [" 'The misconduct must " ' "prejudicially affect . . . the rights of the person against whom the relief is sought so that it would be inequitable to grant such relief." ' " ' "]; 2 Schwing, *supra,* § 45:3, p. 1260 ["courts have ruled that the party seeking to invoke the unclean hands doctrine must have been injured by the alleged wrongful conduct"].) Indeed, Grimes is a beneficiary of whatever arrangement existed between Brown and Ross, because, but for the Ross-Brown relationship, Grimes likely would not have had the opportunity to handle the referred cases and reap millions of dollars in contingent fees. Accordingly, for all the reasons stated, the trial court erred in refusing to enforce the Grimes-Brown fee-sharing agreement on the basis of the unclean hands doctrine.

██ Even if the unclean hands doctrine did bar Brown's action against Grimes, the doctrine cannot be used affirmatively by Grimes to recover on his cross-complaint, for unclean hands is a defense. (See *Stein v. Simpson* (1951) 37 Cal.2d 79, 82–83 [230 P.2d 816]; *DeGarmo v. Goldman* (1942) 19 Cal.2d 755, 764–765 [123 P.2d 1].) Moreover, Grimes's awareness of Ross's activities may also preclude Grimes from any recovery on his cross-complaint. ██ (See *Colby v. Title Ins. & Trust Co.* (1911) 160 Cal. 632, 640 [117 P. 913] ["as a general rule, equity will not aid one party or another to an illegal transaction where they stand *in pari delicto,* but will leave them just where it finds them, to settle these questions without the aid of the court"]; *Jacobs v. Universal Development Corp.* (1997) 53 Cal.App.4th 692, 699 [62 Cal.Rptr.2d 446]; see also *McIntosh v. Mills, supra,* 121 Cal.App.4th at pp. 347–348.)

E. *Enforceability of Illegal Contract*

██ The trial court declared the agreement between Grimes and Brown unenforceable because it violated Texas law in that the clients did not consent to the agreement at the outset of the representation. (See Tex. Disciplinary Rules Prof. Conduct, rule 1.04; see also Schuwerk & Hardwick, Handbook of Texas Lawyer and Judicial Ethics: Attorney Tort Standards, Attorney Ethics Standards, Judicial Ethics Standards, Recusal and Disqualification of Judges (2010–2011 ed.) § 1:18, p. 105, § 3:4, pp. 281–283.) Even though the trial court suggested that California law also rendered the agreement unenforceable, if California law applied, the fee-sharing agreement would be valid to

the extent disclosures to the clients were made prior to payment.[9] (Rules Prof. Conduct, rule 2-200; see *Huskinson & Brown v. Wolf* (2004) 32 Cal.4th 453, 457 [9 Cal.Rptr.3d 693, 84 P.3d 379] [violation of rule renders referral agreement void and unenforceable]; *Chambers v. Kay* (2002) 29 Cal.4th 142, 156 [126 Cal.Rptr.2d 536, 56 P.3d 645]; *Scolinos v. Kolts* (1995) 37 Cal.App.4th 635, 639 [44 Cal.Rptr.2d 31]; Vapnek et al., Cal. Practice Guide: Professional Responsibility (The Rutter Group 2009) ¶ 5:488, p. 5-69 (rev. # 1, 2006) [there is "no equitable estoppel defense to failure to comply with CRPC 2-200"].)

We do not have to determine which law applies to the enforceability of the fee-sharing agreement or the effect of the applicable law on the enforceability of the fee-sharing agreement. We have held that the trial court did not err in finding that Brown could not enforce the fee-sharing agreement against Grimes because of Brown's breach of that agreement. Under both California and Texas law, if the fee-sharing agreement is invalid under state disciplinary laws for enforcement purposes, Grimes cannot recover monies he paid to Brown. The Texas Disciplinary Rules of Professional Conduct provide: "These rules do not undertake to define standards of civil liability of lawyers for professional conduct. Violation of a rule does not give rise to a private cause of action . . . ." (Tex. Disciplinary Rules Prof. Conduct, Preamble: A Lawyer's Responsibilities, No. 15.) California has a similar provision. (Rules Prof. Conduct, rule 1-100(A), par. 4 ["These rules are not intended to create new civil causes of action. Nothing in these rules shall be deemed to create, augment, diminish, or eliminate any substantive legal duty of lawyers or the non-disciplinary consequences of violating such a duty."].) In *Chambers v. Kay, supra,* 29 Cal.4th at page 161, the California Supreme Court, in holding that the plaintiff could not enforce a fee-sharing agreement because the client's consent was not obtained, said that rule 1-100 "does not apply here because no one is attempting to assert a civil cause of action against [the plaintiff] for failure to obtain the requisite written client consent. Nor does anyone contend that *the consent requirement creates a substantive legal duty, a breach of which might give rise to recovery.* . . . [I]t would be absurd for this or any other court to aid [the plaintiff] in accomplishing a fee division that would violate the rule's explicit requirement of written client consent and would subject [the plaintiff] to professional discipline."

We are not aware of any Texas authority inconsistent with the above quoted reasoning of the California Supreme Court in *Chambers v. Kay, supra,* 29 Cal.4th at page 161. Thus, under both California and Texas law, Grimes

---

[9] California law differs from Texas law because in California the required disclosure can be made *after* legal services are provided. (See *Mink v. Maccabee* (2004) 121 Cal.App.4th 835, 838 [17 Cal.Rptr.3d 486].)

cannot, by virtue of the illegality of his fee-sharing agreement with Brown, recover under the cross-complaint amounts already paid to Brown.

### F. Conclusion

Grimes retains more monies than he bargained for and at the expense of Brown, who made the opportunity available to him. This result legally is dictated by the trial court's findings of fact that are basically unchallenged on appeal. Grimes did render the bulk of the legal services that resulted in significant recoveries by the clients and had to incur fees and costs in connection with claims by Ross. Brown will retain substantially more than he would have if he just were awarded his quantum meruit. To the extent the arrangements by the parties violated applicable state attorney disciplinary rules, those rules provide financial and administrative consequences for such violations. (See *McIntosh v. Mills, supra,* 121 Cal.App.4th at p. 348, fn. 16.)

### G. Adequacy of Findings[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

### DISPOSITION

The judgment is reversed with respect to Grimes's cross-complaint against Brown and is otherwise affirmed. Each party shall bear his own costs.

Kriegler, J., concurred.

**ARMSTRONG, Acting P. J.,** Concurring and Dissenting.—I concur in all of my colleagues' analysis except for the conclusion that James L. Brown's breach of a condition not found in the written fee-sharing agreement to pay Ross for services rendered discharged Milton C. Grimes from his duty to perform under the agreement.

The problem with my colleagues' argument is that Grimes, not Brown, is guilty of breaching the fee-sharing agreement. Grimes was obligated to handle and settle the cases and collect the fees. The clients paid Grimes, and Grimes was then to pay Brown an amount equivalent to 40 percent of the fees less expenses: "Grimes would then pay certain expenses and have the contractual obligation to send Brown and the Ammons firm the amounts owed them." (Maj. opn., *ante,* at p. 271.) This is what Grimes did with the first 13 cases that settled. He negotiated the settlements, collected the fees and "As contemplated by the parties, Grimes, after receiving the distributions,

[*]See footnote, *ante,* page 265.

sent Brown his 40 percent share of the fees—$1,342,000—for the cases then settled." (Maj. opn., *ante*, at p. 271.) By paying this sum to Brown, Grimes discharged his contractual obligation to Brown insofar as the 13 settlements were concerned. Grimes did not distribute any part of the $1,342,000 fees to Ross or insist that Brown was obligated to pay some of the fees to Ross under an implied term of the fee-sharing agreement. (Ross was not a party to the agreement and his name was not included in the agreement.)

For the subsequent 40 cases that settled, Grimes, as he did with the first 13 settlements, collected the fees generated by the settlements and divided the fees according to the fee-sharing agreement. Grimes kept his 40 percent share but withheld Brown's 40 percent share, which was approximately $3,791,605.69. Failure to distribute Brown's share was a breach of the fee-sharing agreement. Grimes's excuse for this breach of the agreement was Ross's threatening demand for a share of the settlement fees as a reward for presenting the cases to Brown and Grimes and for working on the cases as an administrator. Grimes believed that it was Brown's obligation to pay Ross, but Brown was adamant he had not agreed to pay Ross a fee.

The situation among Grimes, Brown and Ross became tense and Ross threatened suit. Because of the threatened suit by Ross, and potential liabilities and fees connected with it, Grimes deposited in his trust account, over Brown's objections, Brown's share of the fees as calculated by Grimes. Grimes deposited $3,791,605.69 into the trust account to be paid to Brown when the Ross dispute was settled. Brown did not settle with Ross, and as long as Brown did not settle with Ross, Grimes would not release the fees to Brown, although the money belonged to Brown. Depositing Brown's share of the fees into the trust was also a breach of the fee-sharing agreement. The money belonging to Brown remained in Grimes's trust account.

Subsequently, Ross sued Grimes and Brown. Grimes settled with Ross on the eve of trial. Grimes did not contribute any of his funds to the settlement. Instead, in breach of the fee-sharing agreement and without obtaining Brown's consent, he used $2 million of Brown's funds held in Grimes's trust account to fund the settlement. Judgment in favor of Brown was entered on a complaint filed by Ross. As stated in paragraph 7 of the judgment: "All claims previously asserted by Mr. Ross against defendant Milton C. Grimes are dismissed with prejudice pursuant to the terms of the settlement agreement reached between Mr. Grimes and Mr. Ross." After the payment to Ross, approximately $1,791,605 remained in the trust account. Although Grimes had no legal claim to the balance, he appropriated without Brown's consent all that remained in the trust account, thereby receiving considerably more of the total settlements than he bargained for.

Ross, as part of the Grimes-Ross settlement, accepted the $2 million in full payment of his claims against Grimes and Brown. Since the settlement and judgment extinguished Ross's claim against Brown, the implied "contract" condition that Brown pay Ross for his services was satisfied and the remaining balance, under the breach of contract analysis, should have been distributed to Brown.