Filed 6/24/13  Ramos Oil Co. v. Kang CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| RAMOS OIL CO., INC., | C068512 |
| Plaintiff, Cross-defendant and Respondent, | (Super. Ct. No. CV080000483) |
| v. | |
| SARBJIT S. KANG, Individually and as Partner, etc., et al., | |
| Defendants, Cross-complainants and Appellants. | |

In this appeal from a judgment for breach of a contract to purchase gasoline, defendants assert plaintiff Ramos Oil Co., Inc. (Ramos) has unclean hands for selling them unbranded gasoline.  Defendants fail to appreciate the significance of the trial court's two factual findings:  (1) that the testimony of Ramos's witnesses was credible and (2) that defendants requested the unbranded gasoline.  Defendants also fail to understand the limited scope of appellate review.  On this record, there is substantial evidence to support the trial court's findings, the theory of unclean hands is without

1

support, and the trial court did not abuse its discretion by awarding substantial attorney fees. We affirm.

## FACTS

Ramos is a "jobber": it sells gasoline to retail gas stations. In July 2004 defendants Brentwood American Station (Brentwood), Sarbjit S. Kang (Kang), and Abolghassem H. Shahidi (Shahidi) submitted a credit application to Ramos to allow them to purchase gasoline on credit. Kang and Shahidi provided personal guarantees. Unbeknownst to Ramos, defendant Azad Amiri had been president of defendant Kang Property, Inc. (Kang Property), owned all the shares, and ran the operation. Amiri is a very experienced and sophisticated businessman in the petroleum industry. Brentwood began business as an unbranded gas station.

In January 2005 defendants applied to become a Valero-branded station. They entered into a 10-year contract to purchase a minimum number of gallons of Valero-branded gasoline. They agreed the price for branded gasoline would be the prevailing "rack price" at the time of delivery, plus two cents per gallon and freight charges.

Brentwood did not have a contract with Valero; Ramos did. Under that agreement, Valero agreed to pay for the purchase and installation of Valero signage and related image products at the Brentwood station. If, however, Brentwood "debranded" during the initial 36 months of the 10-year supply contract, Ramos became obligated to repay Valero. The Ramos-Valero agreement was incorporated into the Ramos-Brentwood agreement. Pursuant to their agreement, Brentwood was obligated to reimburse Ramos for the cost of branding and signage if Ramos was required to reimburse Valero.

Veteran Ramos employee Richard Stockton testified to a long-standing relationship with Mr. Kang and his affiliated enterprises. Stockton was in charge of fuels and transportation for Ramos. He explained that Brentwood struggled to pay its bills.

2

The credit manager echoed Stockton's testimony that Brentwood repeatedly paid its bills late.

Stockton testified that Brentwood requested him to deliver several loads of unbranded gasoline after it had become a branded station. Kang, Shahidi, and Amiri denied making such a request. Stockton admitted that he delivered 18 to 20 loads of unbranded gasoline as part of an estimated total of 225 loads of gasoline, branded and unbranded. The unbranded gasoline was cheaper. Asked why he would deliver unbranded fuel when the Ramos contract with Valero prohibited its stations from selling unbranded fuel, Stockton stated, "I thought . . . they were having problems. According to Mr. Kang, that they weren't making money. They wanted to be competitive in the market that they were in. They were not making money with the branded product. I thought I was doing them a favor when they asked for an unbranded load. So I made the mistake of doing somebody a favor." He never supplied unbranded gasoline to any other branded station. Ultimately, Valero conducted an audit of Ramos.

There is also no dispute that Ramos sent Brentwood daily quotations on the price of gasoline. Most of Stockton's interactions were with Amiri's nephew, Ali Amiri. He testified that he believed Brentwood received the quotations because "They would make the comment, gas is going up or gas is going down." Stockton testified there would be a significant discrepancy between the daily fax communications from Ramos that Brentwood received identifying the Valero branded fuel price and the unbranded price that Ramos invoiced Brentwood for the unbranded gas. Nevertheless, Brentwood remained consistently delinquent in paying its bills. The issue came to a boiling point in February 2007.

Ramos threatened to suspend delivery of gasoline. Ultimately, Kent Ramos, president of Ramos; James Wiley, Ramos's credit manager; Stockton; and Kang, Amiri, and Shahidi had a meeting. Kang and Shahidi remained mute. Amiri, the sole spokesman for Brentwood, complained they were not receiving a facilities credit that

3

Valero gave Ramos. According to Wiley, "Mr. Amiri said that he didn't care about the contract, he didn't care who signed the contract, he cared nothing about what I had to say. And what he said is going to be what's going to happen." Ramos insisted then, as it does on appeal, that it has no contractual obligation to pass on the credit. Nevertheless, it agreed in the February meeting to the credit for branded gasoline, which at that time amounted to nearly $20,000. The parties also agreed that Ramos would extend a maximum credit to Brentwood of two loads of gasoline. The issue of unbranded gasoline was not discussed.

Over time, Brentwood repeatedly became delinquent. When Ramos gave notice it would exercise its right to suspend delivery unless the account was brought current, Brentwood owed Ramos $62,304.33. Brentwood offered to pay $12,500 or $12,600, an offer Ramos refused. Brentwood covered its Valero signage and resumed selling unbranded fuel. As a result, Ramos was compelled to pay Valero $30,183.69.

Ramos sued for breach of contract to recover the amount still unpaid for petroleum products, for failing to meet minimum purchase requirements, and for attorney fees and interest. Defendants filed a cross-complaint for breach of contract and related claims.

The trial court entered judgment in favor of Ramos and awarded Brentwood nothing on its cross-complaint. Brentwood raised unclean hands as both a defense and a cause of action in its cross-complaint based on its theory that Ramos had wrongfully and unlawfully sold it unbranded gasoline. In its statement of decision, the court rejected Brentwood's theory of unclean hands.

The court explained: "On the issue of Ramos' sale of Valero 'unbranded' gasoline to Brentwood, Ramos admitted that it sold to Brentwood approximately 20 loads of Valero unbranded fuel. [Citation.] The court finds that Brentwood had knowledge of the sales of unbranded fuel, and that Brentwood's personnel requested Ramos sell it unbranded gasoline to save Brentwood money. The court finds that Richard Stockton and James Wiley were credible on this issue. The court further finds that Ramos did not

4

materially benefit, other than possibly receiving a slightly higher margin from the sales [a fact that was not proven] to sell Brentwood unbranded fuel. Rather, Ramos exposed itself to potential liability to Valero that resulted in Valero's audit of Ramos sales of Valero branded fuel."

The court awarded Ramos $137,493.45 in damages for the sale of fuel, branding fees, and prejudgment interest. The court also awarded Ramos costs and attorney fees. Defendants Kang, Shahidi, Brentwood, Ameri Oil Co., Amiri, and Kang Property appeal.

## DISCUSSION

### I

Defendants would have us believe that, contrary to the trial court's finding, they never requested Ramos to deliver unbranded gasoline, and even if they did, they do not have to pay for the branded gasoline they received because Ramos comes into court with unclean hands. They insist that Ramos breached its contract with Valero by selling unbranded gasoline to them, and that breach provides them an affirmative defense to Ramos's breach of contract claim. Defendants torture the doctrine of unclean hands beyond recognition.

The unclean hands doctrine "demands that a plaintiff act fairly in the matter for which he seeks a remedy. He must come into court with clean hands, and keep them clean, or he will be denied relief, regardless of the merits of his claim. [Citations.] The defense is available in legal as well as equitable actions. [Citations.] Whether the doctrine of unclean hands applies is a question of fact." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978 (*Kendall-Jackson*).)

The trial court made the factual finding that defendants requested the unbranded gasoline. That finding is supported by substantial evidence in that Stockton testified defendants made the request. The trial court expressly found that Stockton and Wiley provided credible testimony on this as well as all relevant issues in the case. Moreover, the trial court could reasonably infer it was far more likely that defendants would request

5

the cheaper gasoline and Stockton would deliver it to minimize defendants' costs as they struggled to pay their bills than that Stockton would breach the Ramos contract with Valero and, without request, decide to deliver cheaper unbranded gasoline.

Nevertheless, defendants insist that the integrity of the judiciary must be protected even if, as the record discloses here, their own integrity is suspect. (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 978.) In their view, Ramos should not be paid because it sold them unbranded gasoline, whether that gasoline was requested or not. According to defendants, Ramos cannot be allowed to sully the civil justice system, even if that means they will enjoy a windfall.

But defendants ignore the central feature of the unclean hands doctrine. "Not every wrongful act constitutes unclean hands." (*Kendall-Jackson*, *supra*, 76 Cal.App.4th at p. 979.) The plaintiff's alleged misconduct must be the instrumentality of harm. (*Blain v. Doctor's Co*. (1990) 222 Cal.App.3d 1048, 1063.) The unclean hands doctrine does not apply if the wrongful conduct did not occur within the transaction upon which the plaintiff is seeking relief. (*O'Flaherty v. Belgum* (2004) 115 Cal.App.4th 1044, 1060.) " 'The party against whom the unclean hands doctrine is invoked must have "directly infected" the actual cause of action before the court . . . .' " (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 283 (*Brown*).)

Here, plaintiff's claim for damages is based on defendants' breach of the 10-year fuel supply agreement for branded fuel. The executed oral agreement for 20 loads of unbranded fuel has no connection to plaintiff's claim that defendants failed to bring their account current for the branded gasoline it delivered and failed to purchase the monthly minimum quantity of gasoline. They are distinct contracts. Defendants' attempt to corrupt the notion of unclean hands to include plaintiff's alleged breach of its contract with Valero is reminiscent of the vain attempt by a lawyer in *Brown*, *supra*, 192 Cal.App.4th 265 to renege on a fee-sharing agreement because he had failed to pay a

third party, who was not a lawyer, for referrals. The *Brown* court found the unclean hands doctrine inapplicable for a number of reasons equally applicable here.

In *Brown*, a lawyer agreed to share with another lawyer fees arising from a number of Texas lawsuits. When he attempted to collect on the fee-sharing agreement, the other lawyer raised unclean hands as an affirmative defense, alleging that the plaintiff lawyer had entered into an unethical agreement with a former lawyer who had resigned from the bar and therefore could not share fees. The court found that the fee-sharing agreement with the former lawyer was attenuated, at best, from the fee-sharing agreement the plaintiff lawyer sought to enforce.

The court explained: "Grimes had no interest in how Brown fulfilled his promise to compensate Ross. Brown had an obligation to take care of Ross's claims for compensation, and that obligation did not have to be fulfilled by the alleged fee-splitting arrangement. Thus, there is no connection between the offending Brown-Ross agreement and the amount Brown claims from Grimes. The unenforceability of the Brown-Ross agreement affects only the relationship between Brown and Ross." (*Brown*, *supra*, 192 Cal.App.4th at p. 283.)

Defendants cite to Penal Code sections 350 and 351a as support for their assertion that Ramos broke the law by selling unbranded gasoline, knowing it would be sold to the public as branded. Again, they contend this criminal conduct bars plaintiff's contractual recovery for branded gasoline. Preliminarily, we note that there has been no finding that plaintiff broke the law. The court in *Brown* rejected a similar argument as follows: "[T]he illegality of the Brown-Ross agreement or of Ross's activities did not directly affect the Grimes-Brown agreement or make it illegal or otherwise unenforceable." (*Brown*, *supra*, 192 Cal.App.4th at p. 283.)

And more to the point, the *Brown* court found that it would not be inequitable to enforce the contract at issue notwithstanding an illegal contract between the plaintiff lawyer and the nonlawyer. "Grimes knew of Ross's activities and that Ross was to be

7

compensated, and Grimes knew about the 90/10 fee split between Ross and Brown before he received much of his compensation. He was not adversely affected by the nature of the Brown-Ross agreement." (*Brown*, *supra*, 192 Cal.App.4th at pp. 283-284.) Indeed, Grimes was a beneficiary of the fee-splitting agreement with the nonlawyer who was the source of the referrals that generated the millions of dollars of contingent fees.

Similarly, defendants requested unbranded gasoline. They knew they could not sell unbranded gasoline in their branded station. Like Grimes, they benefited from Ramos's breach of its agreement with Valero. There is simply nothing inequitable about compensating Ramos for branded gasoline under the written agreement, which was unrelated to the oral contract to provide a relatively small number of loads of unbranded gasoline.

Defendants make the somewhat related claim that delivery of unbranded gasoline constituted a material breach of contract and therefore the trial court erred by awarding contract damages. They contend there is insufficient evidence to support the trial court's finding that they ordered the unbranded gasoline. As pointed out above, the court's finding is supported by Stockton's testimony that defendants requested the unbranded gasoline. That finding is more than ample support for the award of contract damages for nonpayment.

## II

Defendants object to the award of attorney fees because the invoices attached to the declaration of plaintiff's lawyer have been redacted. They speculate, without any support, that they may have been charged for fees related to Ramos's potential liability to Valero for selling unbranded gasoline. Although they do not cite to an appropriate standard of review, they contend the trial court could not have carefully reviewed the fee request and could not have determined whether the fees were reasonable. We disagree.

We review an award of attorney fees for an abuse of discretion. (*Akins v. Enterprise Rent-A-Car Co.* (2000) 79 Cal.App.4th 1127, 1134.) The award will be

8

upheld unless "the amount awarded is so large or small that it shocks the conscience and suggests that passion and prejudice influenced the determination." (*Ibid.*) In this case, the judge who presided over the five-day court trial reviewed the attorney declaration and the redacted invoices and then declined an invitation to review the unredacted invoices in chambers. The trial court is in the best position to assess the value of legal services and is not obligated to explain its rationale unless requested to do so. (See *Children's Hospital & Medical Center v. Bontá* (2002) 97 Cal.App.4th 740, 777; *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1140.)

Attorney declarations alone attesting to the number of hours spent and the hourly billing rates are sufficient; billing statements are not the only means to provide such information. (*Martino v. Denevi* (1986) 182 Cal.App.3d 553, 559.) Plaintiff's counsel provided a declaration under penalty of perjury describing the type of services provided, including depositions and motions, phone calls, client meetings, review of factual background and documents, and discussions of trial strategy. Counsel explained how the case was transformed from a simple collection case to a complicated, time-consuming case due to defendants' litigation strategy, including a bogus motion for a change of venue, a failed settlement conference, discovery responses vastly expanding plaintiff's financial exposure, and an aggressive cross-complaint. Preparation for trial increased proportionately.

Of course, the party opposing the fee award is responsible for furnishing an adequate record on appeal. (*Maria P. v. Riles* (1987) 43 Cal.3d 1281, 1295-1296.) Defendants, however, submitted no evidence in opposition to the motion for attorney fees. We certainly cannot say the trial judge, who presided over the trial and had the opportunity to personally assess the quality of the representation, the necessity for the time spent, and the complexity of the case, abused his discretion when defendants have provided absolutely no specific evidence supporting their allegation that they might have

9

been charged for unrelated matters or controverting the evidence presented in support of the fees.

Moreover, it is proper to redact information from invoices that are protected by the attorney-client privilege. While the redactions are quite aggressive, in light of the entire record in this case, including the declaration filed in support of the fees, we cannot say the trial court abused its discretion.

## DISPOSITION

We affirm.


                                        RAYE            , P. J.


We concur:


        NICHOLSON        , J.


        DUARTE          , J.


10