Filed 6/17/14  Southern California Noble Development v. PRP Investors Fontana CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| SOUTHERN CALIFORNIA NOBLE DEVELOPMENT, INC., <br><br> Plaintiff and Respondent, <br><br> v. <br><br> PRP INVESTORS FONTANA, LLC, <br><br> Defendant and Appellant. | G049499 (Consol. with G049511) <br><br> (Super. Ct. No. CIVDS900773) <br><br> O P I N I O N |

Appeal from a judgment and postjudgment order of the Superior Court of San Bernardino County, Gilbert G. Ochoa, Judge.  Affirmed.

Best Best & Krieger, Howard B. Golds, and Scott W. Ditfurth for Plaintiff and Respondent.

Alston & Bird, Mark D. Johnson, and Jessica L. Sharron for Defendant and Appellant.

\*          \*          \*

Plaintiff and general contractor Southern California Noble Development, Inc. (Noble), sued defendant and developer PRP Investors Fontana, LLC (PRP), for breach of contract for failing to pay Noble on a large construction project. PRP later filed a separate lawsuit against Noble alleging inter alia, negligence and breach of contract, contending Noble did shoddy work. The cases were consolidated in the trial court. A jury returned a verdict in favor of Noble in the amount of $1,596,731.

On appeal, PRP contends that substantial evidence does not support the verdict, that the jury's damages award fails to account for undisputed offsets to reflect payments PRP made directly to Noble's subcontractors, and that the trial court improperly granted a nonsuit on PRP's negligence cause of action. We hold that PRP forfeited its substantial evidence argument by failing to present an adequate statement of facts, that the jury did properly account for offsets, and that PRP forfeited its negligence argument by failing to tender a prejudice argument.

FACTS

This construction dispute arises out of a project to build the "Shops at Sierra Lakes," which is a 14-acre shopping center and medical office building located in Fontana. The developer of the project was PRP, of which one of the owners is Brett Del Valle. The general contractor was Noble, which is owned by Mike Spencer.

Prior to the Shops at Sierra Lakes project, Noble was working on another project developed by PRP, which was a shopping center with a Rite Aid. While that construction was ongoing, another partner at PRP approached Spencer and asked him to bid on the Sierra Lakes project. That bid was ultimately accepted, and in November 2007, PRP and Noble signed a contract for the construction of the project.

Noble was to be paid a total of $12,209,836. Under the contract, Noble would make monthly applications for progress payments covering the work that was done

2

that month, and PRP had 30 days from receipt of the application to pay Noble. PRP was financing the project primarily with a loan from California National Bank.

From the outset, PRP ran into financial troubles. For example, early in the process PRP asked Spencer to back out from the bid $750,000 of essential work, such as heating, ventilation, and air conditioning, dry utilities, plumbing, and electrical. The plan was to reintroduce that work into the project through change orders, which would permit PRP to tap into a contingency loan fund that was supposed to be for "uncertainties and overruns." Del Valle never told the bank about this plan.

On two occasions PRP used a sort of bait-and-switch technique to obtain loan disbursements to make payments to Noble. PRP would issue a check to Noble from a different bank account, but ask Noble not to cash the check and to send PRP an unconditional release reflecting payment. PRP would then take that release to California National Bank, who disbursed additional funds in reliance on the release. PRP then used those funds to wire money to Noble and make the real payment. Again, Del Valle never told the bank about this scheme.

Also, a bank officer testified that PRP was sometimes late on its interest payments, which prevented the bank from disbursing funds.

Finally, at a meeting with Spencer, Del Valle commented that all of the subcontractors would have to take a 20 percent "haircut" on the amounts they were owed.

Consistent with these financial struggles, as early as Noble's second pay application, covering the month of January 2008, PRP was unable to make a timely payment. Payment for January work was not received until April 2, 2008. This pattern continued throughout the project. The March 2008 pay application, which was submitted April 2, was paid May 14. The April 2008 pay application was submitted May 3. It was paid in part on June 25 and in full on July 3. The May 2008 pay application was submitted June 6 and was paid on July 15. The June 2008 application was submitted July 25 and paid September 3. The July 2008 application was submitted August 19 and paid

3

October 6.  The August 2008 application was submitted September 10.  It was partially paid on November 3.  Another portion was paid on November 7.  With approximately $800,000 still owing on the August application, PRP never made another payment.

According to Del Valle, in early November PRP made a "business decision" to suspend payments to Noble.  He claimed to have made this decision due to his perception of construction defects and the fact that some subcontractors placed liens on the project because they were not being paid.  PRP's position at trial was that Noble was obligated under the contract to continue paying subcontractors even though PRP was not paying Noble.

PRP never bothered to inform Noble that it had suspended payments.  Nor is there any contemporaneous written documentation of any objection to the quality of Noble's work.  To the contrary, at around the time of allegedly becoming dissatisfied with Noble's work, it actually *expanded* Noble's work to include off-site work that was supposed to be performed by another contractor.  And despite having made the "business decision" to stop paying Noble, PRP continued approving pay applications and change orders through December.

Noble gave notice of substantial completion of the project on August 31, 2008, and absolute completion on October 14, 2008.  "Absolute completion," however, was somewhat of a misnomer, because after that a "punch list" process was supposed to have occurred.  That process involved the architect and owners walking the entire project to review all of the construction and note the areas where the construction deviated from the plans and specifications.  The contractor would then be required to fix all of the defects noted in the punch list.  To ensure the contractor had sufficient incentive to return to complete those items, PRP was entitled to withhold 10 percent of every payment made to Noble, called the "retainage."  Noble would only receive the full retainage after completing the punch list items.  As one PRP witness explained, the retainage was the

4

"hammer" to ensure Noble would finish the job. The punch list process was never completed on this project, however, because PRP stopped paying Noble.

Towards the end of the project, subcontractor liens were beginning to accumulate, and on December 10, 2008, Noble filed its own lien on the project for $3,343,409, which represented the amount still owing on the contract plus change orders.

The bulk of the one-month trial was taken up with PRP's evidence of Noble's allegedly defective work. PRP generated a list of 341 alleged defects on the project. Not all were discussed at trial. An example of one of the defects that received more attention at trial was that the parking lot was defectively constructed such that there were "birdbaths" — pooling of water — and an improper flow of water. This concern was not brought to anyone's attention, however, until November 28, 2008, after PRP had stopped paying Noble. Another example was that the rebar in the concrete floors was allegedly installed below the concrete floors, instead of within, which will likely cause future cracking of the concrete. Spencer denied this accusation. There was also testimony that irrigation pipes were improperly installed with rocky soil surrounding them, causing them to break. And there was testimony that the roof of the medical office building was leaking water into the interior of the building.

Noble raised various points to impeach the evidence of these alleged defects — at times quite effectively — but Noble's fundamental response to the allegations was that all of these alleged defects would have been identified and fixed pursuant to the punch list process. Those corrections were never made, however, because PRP stopped paying Noble, and the subcontractors would not finish their work without being paid.

PRP put on evidence that, after Noble stopped working, PRP directly paid off some subcontractors, and PRP sought an offset to any damage award in favor of Noble in the amount of those payments. As evidence, Del Valle produced a chart listing all of the various subcontractors PRP paid and the amount of the payments. The total

5

amount, according to Del Valle, was $2,277,827.10. He did not, however, provide any backup documentation to support the amounts on the chart. And under cross-examination it became clear there were some problems with the chart. To begin with, Del Valle did not prepare it, his sister in the accounting department did. Also, there was at least one duplicate entry, one entry for payments to PRP's attorneys, one entry that had not actually been paid in full, and payments by entities other than PRP.

During closing argument, Noble's counsel conceded PRP was entitled to an offset to the extent PRP paid Noble's subcontractors, but lamented there was no reliable evidence upon which to determine the amount: "And then by the way, they paid the subs and there's something I do want to make clear. To the extent they paid the subcontractors, they are entitled to an offset . . . . That's absolutely clear." "But do remember that they admitted that the way they paid the subs was by giving them a haircut." "[O]n the one hand, they are entitled to [an] offset for those payments. But I can't tell you that I know how much they paid, because I don't think the evidence they presented was particularly complete."

Noble filed its complaint in January of 2009. In April of that year, PRP filed its complaint against Noble. The causes of action ultimately taken to trial were Noble's claim for breach of contract, and PRP's claims for breach of contract, fraud, and negligence. The trial lasted approximately one month.

After both parties rested, Noble moved for a nonsuit as to the negligence cause of action, which the court granted. The court viewed PRP's negligence claim as merely a restatement of the breach of contract claim, and thus improper under *Stop Loss Ins. Brokers, Inc. v. Brown & Toland Medical Group* (2006) 143 Cal.App.4th 1036, 1041.

The jury returned a verdict on the remaining causes of action. The jury unanimously found in favor of Noble on its breach of contract claim. It found by a vote of 11 to one that Noble had been damaged in the amount of $1,596,731. In a handwritten

6

note on the verdict form, the jury set forth its calculation as follows: It began with a contract amount of $13,299,485, subtracted the 10 percent retainage in the amount of $1,329,948, subtracted the amount PRP had already paid Noble in the amount of $10,262,060, and subtracted $110,746 in unfinished work to arrive at its damages figure.

With respect to PRP's breach of contract cause of action, the jury answered the following questions in the negative: "Did PRP Investors Fontana, LLC do all, or substantially all, of the significant things that the contract required it to do?" and "Was PRP Investors Fontana, LLC excused from having to do all, or substantially all, of the significant things that the contract required it to do?" With respect to the fraud cause of action, the jury answered the following question in the negative: "Did Michael Spencer make a false representation of an important fact to PRP Investors Fontana, LLC?"

The parties filed multiple posttrial motions. PRP filed motions for new trial, JNOV, and reconsideration of the nonsuit motion, all of which were denied.

Noble filed a motion to foreclose on its mechanic's lien in the amount of the jury verdict. The court denied the motion in a detailed minute order. In doing so, the court took issue with the jury's verdict, stating, "it does not appear that the jury took into account the payments PRP made directly to Noble's subcontractors." "Nothing in the pre-printed portion of the Special Verdict form addresses these offsets, nor is there anything in the jury's hand-written calculations that indicates that the jury took these undisputed offsets into account."

The court, nonetheless, entered judgment on the jury verdict, from which PRP timely appealed. Thereafter, the court granted Noble's motion for attorney fees in the amount of $472,000, from which PRP again timely appealed.

DISCUSSION

*PRP Waived Its Substantial Evidence Argument*

PRP first contends substantial evidence does not support the breach of contract verdict in favor of Noble. PRP's deficient statement of facts waived that argument.

"A party who challenges the sufficiency of the evidence to support a finding must set forth, discuss, and analyze *all* the evidence on that point, *both favorable and unfavorable.*" (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218, italics added.) As another court explained, appellants "fundamental obligation to this court, and a prerequisite to our consideration of their challenge" (*Schmidlin v. City of Palo Alto* (2007) 157 Cal.App.4th 728, 738), is to "set forth the version of events *most favorable to* [*respondent*]" (*id*. at pp. 737-738). "The duty to adhere to appellate procedural rules grows with the complexity of the record." (*Western Aggregates, Inc. v. County of Yuba* (2002) 101 Cal.App.4th 278, 290.) "Accordingly, if, as defendants here contend, 'some particular issue of fact is not sustained, they are required to set forth in their brief *all* the material evidence on the point and *not merely their own evidence*. Unless this is done the error is deemed to be waived.'" (*Foreman & Clark Corp. v. Fallon* (1971) 3 Cal.3d 875, 881.)

In this case, where the trial lasted one month, resulted in a 10 volume reporter's transcript and six volume appellant's appendix, PRP's statement of facts spans less than one page. The facts stated in that one page are only the most basic introductory facts, such as the identity of the parties and the amount of the contract. The remaining six pages of the combined "Statement of Facts and Procedural History" are entirely procedural history. Although more facts are recited in the argument section, PRP does nothing more than selectively recite the evidence that supported its argument at trial that Noble performed defective work. There is, for example, no mention of PRP failing to

8

make timely payments. There is no mention of Del Valle's "business decision" to stop paying Noble, nor that payments were only furnished through mid-August of 2008. And there is no mention that most, if not all, of the alleged defects were punch list items.

PRP defends its tactic by arguing that the foregoing facts are not "material evidence on point," citing *Foreman*, *supra*, 3 Cal.3d at page 881, because they are not relevant to whether Noble breached its duties under the contract. PRP misunderstands both its burden on appeal and the relevant contract principles.

It should be self-evident that an appellant may not completely ignore the respondent's evidence and argument on the very finding appellant challenges as insufficient on appeal. To the extent the appellant feels the evidence adduced was, as a matter of law, insufficient to support the finding, the proper approach is to recite the evidence in the statement of facts and then explain in the argument section why the evidence is insufficient.

Further, in this case PRP is plainly wrong that its nonpayment was irrelevant to whether Noble breached the contract. It is blackletter law — spelled out clearly in the verdict form used in this case — that where one party materially breaches a contract, it may excuse the other party from continued performance under the contract. (*Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277 ["When a party's failure to perform a contractual obligation constitutes a material breach of the contract, the other party may be discharged from its duty to perform under the contract"].) That was precisely Noble's theory at trial. It acknowledged it did not perform the punch list process, but argued Noble's failure to pay excused continued performance. It was also precisely what the jury found. PRP needed to address it.

9

PRP's statement of facts was not only inadequate, but, due to the almost total absence of factual context, the brief was largely unintelligible without first reading through the lengthy record. Accordingly, we deem PRP's substantial evidence challenge to be waived.[1]

*There Was No Error in the Award of Damages*

Next, PRP contends the jury failed to provide for undisputed offsets to Noble's damages to account for payments PRP made directly to Noble's subcontractors. We disagree.

While Noble conceded that PRP made some payments to subcontractors that would qualify as offsets, PRP's evidence in support of the amount of offsets was weak and impeached. As we noted in the statement of facts, the only evidence of the amount of subcontractor payments was Del Valle's testimony about a chart that he did not even prepare. PRP presumably was in the best position to submit backup documentation to substantiate those payments, but for whatever reason chose not to. Further, cross-examination revealed flaws in the chart, such as duplicate entries, payments to PRP's attorneys, amounts that had not actually been paid, and payments made by entities other than PRP. Finally, Del Valle himself was impeached throughout the trial and generally not a persuasive witness. The instances of impeachment are too numerous to recount, but perhaps the most significant vulnerability in his testimony was his explanation of why he stopped paying Noble. He claims it was a "business decision,"

---

[1] We also feel compelled to disapprove of PRP's claims in the statement of facts and procedural history that Noble "*deceived* the trial court by *misrepresenting* the law"; that it "failed to advise the trial court that this *specious* argument was previously rejected"; that it "*hid* from Judge Ochoa that this exact argument was rejected by" another judge; and by referring to the motion as a "*ludicrous* non-suit motion . . . ." (Italics added.) Attacks on the character of opposing counsel are not well received in this court, and pejorative adjectives do not persuade.

10

but there was no contemporaneous written evidence of this decision, and his project manager — the individual who approved pay orders and change orders — testified he was unaware of any business decision to stop paying Noble. Thus there was little reason to believe him. But if the jury did believe him, things only got worse: he continued approving pay applications and change orders after the "business decision" with no intent to actually pay them. That is fraud. Either way, he was not a believable witness.[2]

Thus the jury was left in the unenviable position of trying to calculate the amount of offsets without any reliable evidence upon which to base the calculation. In our view, the jury pointed to the only objective number at hand to account for offsets, which was the amount of the retainage. This made some sense. Noble had already submitted notice of completion of the project, which left only the punch list items remaining to be completed, which was to be paid for with the retainage. The retainage thus provides a rough, if imperfect, estimate of what was left to be accounted for.

In any event, the reason the jury was in this unenviable position was PRP's failure to produce reliable evidence of the amount of subcontractor payments. The jury did the best it could with a bad situation, and we will not permit PRP to benefit from the ambiguity it created.[3]

---

[2] Del Valle offered two explanations in his defense for approving pay applications after the "business decision," neither of which are persuasive. First, he testified he was "working things out" with Noble, but, again, there is no contemporaneous evidence to prove that claim. The contemporaneous evidence that exists simply suggests he was struggling to fund the project, and Spencer denied there were any communications about working defects out. Second, he points to a contract provision which permits PRP to withhold payment to Noble for various reasons, including defective work, third-party liens, and breach of the contract. But that section permits withholding of payment upon "receipt" of a pay application, not upon *approval* of it.

[3] We recognize that in denying Noble's motion to foreclose on a mechanic's lien, the trial court found the jury had not accounted for offsets. That ruling has not been appealed, however, and, importantly, the trial court did *not* grant a new trial motion on

11

*PRP Forfeited Its Negligence Claim by Failing to Articulate a Prejudice Argument*

Finally, PRP contends the court erred in granting a nonsuit as to the negligence cause of action. PRP makes two arguments. First, it contends the court was bound by the ruling of a different judge who overruled a demurrer to PRP's negligence cause of action. Second, it contends the evidence was sufficient to support a verdict for negligence.

PRP's negligence claim, however, appears to be totally redundant with its breach of contract claim. The contract explicitly requires Noble to complete the project "in a skillful and workmanlike manner," and from our review of the record, all of the damages PRP sought through its negligence claim were also sought through its breach of contract claim.

In light of this overlap, it was incumbent upon PRP, as it is upon all appellants, to explain what prejudice it suffered as a result of the alleged error. (Cal. Const., art. VI, § 13 ["No judgment shall be set aside . . . unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice"]; *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 106 ["But our duty to examine the entire cause arises when and only when the appellant has fulfilled his duty to tender a proper prejudice argument. Because of the need to consider the particulars of the given case, rather than the type of error, the appellant bears the duty of spelling out in his brief exactly how the error caused a miscarriage of justice"].) PRP does not even mention prejudice in connection with this issue in its opening brief. Noble pointed out that omission in its respondent's brief, with citations to authority and under a separate heading. In its reply brief, PRP buried its two sentence response in a section otherwise having nothing to do with prejudice: "This error harmed PRP by disallowing PRP to pursue its negligence claims and receive

---

that basis. The record does not reveal why that is. But given this procedural posture, we need not defer to the trial court's observations in connection with the foreclosure motion.

12

compensation for the property damage.  Further, the decision confused the jury as to the nature of the claims and unfairly prejudiced PRP."

PRP's prejudice argument is insufficient for a number of reasons.  First, a conclusory statement of prejudice does not fulfill an appellant's burden to offer detailed reasons, with citations to authority and to the record, for why the alleged error was prejudicial.  (*Badie v. Bank of America* (1998) 67 Cal.App.4th 779, 784-785 [when an appellant raises an issue "but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)  Second, arguments made for the first time in a reply brief are generally forfeited.  (See *Shade Foods, Inc. v. Innovative Products Sales & Marketing, Inc.* (2000) 78 Cal.App.4th 847,894-895, fn. 10 ["""points raised in the reply brief for the first time will not be considered, unless good reason is shown for failure to present them before"""].)  And third, arguments not made under a separate heading with citations to authority and to the record are likewise forfeited.  (*In re Marriage of Carlsson* (2008) 163 Cal.App.4th 281, 294 ["Because this argument is not presented under a separate heading, it is forfeited"]; Cal. Rules of Court, rule 8.204(a)(1)(B).)

There may very well be a cogent explanation for why the alleged error was prejudicial, but "[a]n appellate court is not required to examine undeveloped claims, nor to make arguments for parties." (*Paterno v. State of California*, *supra*, 74 Cal.App.4th at p. 106.)  Since PRP did not bother to explain why the alleged error was prejudicial, the argument is forfeited.

*Attorney Fees*

PRP also contends that if we reverse the judgment, we should reverse the attorney fees award as well.  Since we do not reverse, we affirm the attorney fees award.

13

## DISPOSITION

The judgment and postjudgment order are affirmed. Noble shall recover its costs incurred on appeal.

IKOLA, J.

WE CONCUR:

O'LEARY, P. J.

MOORE, J.