Filed 12/9/14  Patel v. Arkesh Ventures CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| MAYUR PATEL,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>ARKESH VENTURES, INC.,<br><br>        Defendant and Respondent. | A141086<br><br>(Alameda County<br>Super. Ct. No. RG10551868) |

Mayur Patel sued Arkesh Ventures, Inc. (Arkesh) for specific performance of a purported contract to purchase an inn and spa business.  After a court trial, the trial court held the one-half page document on which Patel relied was a nonbinding letter of intent, not a final, binding contract.  On appeal, Patel contends the trial court misconstrued the document in issue and ignored extrinsic evidence showing it constituted a fully enforceable contract.  We affirm the judgment.

## I.  BACKGROUND

The Purple Orchid Inn (Purple Orchid) is an inn, spa, and special event facility located on a 20-acre parcel of real property (the property) in Livermore, California.  Kaushik Banerjee, through his corporation, Arkesh, owned and operated the Purple Orchid and the property in November 2010.

The Purple Orchid's revenues and margins had declined between 2008 and 2010, to the point where the business was losing money or just breaking even.  Banerjee, who had other business interests in the technology field, felt it had become too time-consuming for him to manage the business.  In September 2010, Banerjee entered into a

listing agreement with a real estate broker, Steven Wang, and had begun actively marketing the business, but no offers had been made. Banerjee hoped to sell the business and the property as a package for somewhere in the range of $4.7 to $5 million.

Banerjee, Patel, and their spouses had been acquainted with each other as social friends for several years. In November 2010, Banerjee and Patel began to discuss potential terms for Patel to purchase the Purple Orchid property and business from Banerjee. Patel made it clear to Banerjee from the outset of the negotiations that he did not have any cash to put down for the transaction. Banerjee worked with Steven Wang to come up with transaction terms for Patel that would not require a cash downpayment. Between November 24 and November 29, Banerjee and Patel discussed and exchanged e-mails concerning the business's financials, as well as ideas for structuring a no-cash-down purchase and sale of the business and property. Banerjee told Patel the business had declined in recent times, but Patel believed he could make it profitable again. Patel had managed and owned hospitality businesses in the past. According to Banerjee, in all of these discussions Patel's proposed purchase price for the business and property was in the range of $4.5 to $4.9 million, depending on how the purchase was to be financed. Patel testified Banerjee told him he was listing the business and property for sale at $3.5 million.

At the same time these discussions were going on, Wang was assisting Banerjee in requesting a loan modification from Banerjee's mortgage lender, America California Bank, to reduce his mortgage expenses which were running at approximately $18,500 per month. The loan balance at the time was approximately $2.3 million. According to Banerjee, he kept Patel informed of his loan modification negotiations with the bank, and of the fact that he was trying to negotiate a monthly mortgage payment of between $12,000 and $15,000. A November 25, 2010 e-mail from Banerjee to Patel states: "I will negotiate $12K/mo for 8 Years & then adjust Rates. [¶] . . . For me of course $12K–$15 but of course $15K will greatly help me . . . . [¶] . . . Please confirm your comfort

2

level on this before I finalize with Bank by next week."[1]  According to Patel, Banerjee "mentioned to [him] that the bank was waiting to review his mortgage payments and the new figure was 12,000."  Patel testified it was his "understanding" the bank had in fact approved $12,000 per month.

On November 29, 2010, Wang e-mailed Banerjee a draft "letter of intent" containing proposed terms for the sale of the business and property.  Wang could not remember if the "letter of intent" template was his idea or Banerjee's idea.  Working from Wang's draft and his previous negotiations with Patel, Banerjee typed up a document describing proposed terms for the sale of the business and property, with blank signature spaces for both parties at the bottom (hereafter Exhibit 9).  Banerjee forwarded Exhibit 9 to Patel on November 29, and the two discussed it face-to-face that day or the next.  The relevant text of Exhibit 9 is as follows:

"Dear Mr. Banerjee:

"This is to signify my intention to purchase the real estate and business operation of the Purple Orchid Inn located at 4549 Cross Road, Livermore, CA.

"The terms of the Lease to Purchase are as follows:

"Buyer to pay Monthly Mortgage      $12,000/mo for 6 years beginning Dec, 2010 due 10th of each month

"Buyer to pay lease payment          $12,000/mo for 8 years beginning Dec 2010 due 8th of each month

"I agree to the Following 2 Balloon Payments:

"Mortgage     :        $2.1M at the end Year 2016

"Balloon Payment Owed to Arkesh Ventures      $1.8M (includes 1.05% interest) at Dec 1st 2018

"The purchase will be structured as a lease with option to purchase by December 1st, 2018.  Buyer assumes all the business and financial responsibility of

---

[1] The sentence beginning with "For me" apparently refers to the amount of the monthly lease payments Banerjee was hoping to receive from Patel.

3

operating the Purple Orchid Inn.  Upon the maturity of the first loan, I shall have the current loan paid off or financed under me."

The foregoing text was followed by blank signature spaces for "Buyer" and "Seller."  On December 2, 2010, Patel and Banerjee met at the Purple Orchid and signed Exhibit 9.

Banerjee explained that he expected to receive $4.7 million for the sale of the business and the property under Exhibit 9.  Although the record is somewhat ambiguous on this point, it can be inferred from Banerjee's testimony and the terms set out in Exhibit 9 that the net proceeds he expected to realize consisted of the 96 monthly lease payments of $12,000 (totaling $1.152 million), plus the two balloon payments (totaling $3.9 million).  If Patel made these payments, Banerjee would receive a total of $5.052 million in cash proceeds and debt reduction.  Using the annual interest rate specified in Exhibit 9, this closely approximates $4.7 million plus simple interest on the unpaid balance of 1.05 percent per year for eight years.  This appears to be the "Lease to Purchase" structure Banerjee contemplated in Exhibit 9.

At the same time, Patel's monthly mortgage payments to Banerjee under Exhibit 9 were not intended to be proceeds to Banerjee from the sale.  As noted earlier, Exhibit 9 provided that Patel "assumes *all* the business and financial responsibility of operating the Purple Orchid Inn."  (Italics added.)  The cost of servicing the bank debt on the property was simply one of the operating expenses of the Purple Orchid Patel was assuming.  Patel had explicitly taken that into account when he reviewed the Purple Orchid's profit and loss statements and decided he could make the business profitable.  But because Banerjee's name remained on the loan, Patel paid Banerjee instead of the bank, and Banerjee passed the payments on to the bank.  Banerjee derived no net benefit from this.  Unlike the 2016 balloon payment of $2.1 million, the mortgage payments were interest-only and did not increase Banerjee's equity interest in the property.

Patel began working with Banerjee in the operation of the business the day Exhibit 9 was signed, and Banerjee immediately began sending out announcements to his vendors that he had sold the Purple Orchid to Patel.  However, according to Banerjee,

4

Patel knew when he signed Exhibit 9 that Banerjee was still negotiating with the bank over the loan modification terms and monthly payment, and "knew the final number would be nailed down once I got the number from the bank." Banerjee regarded Exhibit 9 as only a "working document in progress until we get to the formal lease agreement," and a "talking piece of paper between me and him." He testified he told Patel, "let's just get this as a working document between us, and we'll get a formal one from my attorney." Banerjee stated he impressed upon Patel that he wanted both of them to have a "rudiment" of how much he was going to get paid in December: "So there's two steps in my mind: One is that I was going to [get] a real estate person to draft the lease agreement with all the terms and verbiage that the California law requires; and then the second is have [a] lawyer . . . review it. . . . So this is just to hold us by because we're conducting business. . . . And I wanted him to know that at least this is the payment I'm expecting. . . ." According to Patel, at the time Exhibit 9 was signed Banerjee never said anything to the effect that this was not the final agreement or there was going to be another more formal agreement. Patel testified he understood it to be the final agreement concerning the sale of the business.

Banerjee agreed he would carry the business payroll until December 7, 2010, and ensure all vendors and utilities were paid up through the end of November 2010, and he handwrote these terms on Exhibit 9. On December 7, Banerjee met with America California Bank loan officers to discuss his loan modification request. The bank proposed a reduced, interest-only monthly payment of $13,500, combined with other terms. Banerjee agreed to that amount. In a follow-up e-mail the next day, the bank requested a copy of Arkesh's lease agreement with Patel among other items.

On December 8, Patel had the credit card swipe machine changed over from Arkesh's name to his name, but he failed to make the $12,000 lease payment to Banerjee called for on that date by Exhibit 9. On December 10, Banerjee spent the morning at the Purple Orchid. Patel gave Banerjee a personal check for $6,000 that morning which was drawn on his Discover credit card. He testified Banerjee had previously readily agreed to

5

accept the $6,000 payment and to defer payment of the remaining $18,000 for December until December 20, without asking questions.

According to Banerjee, his acceptance of the late $6,000 payment on December 10 and agreement to defer payment of the $18,000 that was overdue were conditioned on Patel's agreement the equity in his home could be used as collateral in the event of a future default in his payments. Banerjee testified he and Patel had discussed the fact that Patel lacked short-term working capital. Patel brought up the idea of using the equity in his home as collateral for any future default. When Patel told Banerjee he could not make his payments on December 8 and 10 and asked for more time, Banerjee agreed, provided Patel's home equity was put up in some fashion as collateral in the event of a future default. On this point, Patel testified only that he agreed the equity in his home was one option for meeting his financial obligations.

Banerjee also testified he and Patel discussed the bank's loan modification offer on the morning of December 10 and Patel agreed the monthly mortgage payment amount under Exhibit 9 would be increased from $12,000 to $13,500. While working in another room at the Purple Orchid, Banerjee sent Patel an e-mail at 9:55 a.m. confirming these points and attaching a modified version of Exhibit 9 reflecting the monthly mortgage payment increase to $13,500. The e-mail also stated Banerjee was instructing his "Folks" who were "drafting the Agreement" to include these new terms.[2] In a follow-up e-mail one minute later, Banerjee wrote: "Starting January I have set up an account where you can do a direct ACH on the days we have agreed upon for $13,500 & $12,000." Banerjee testified he and Patel both signed a printed copy of the modified version of Exhibit 9 at some point that morning, but Patel had apparently later removed the folder containing the

---

[2] Banerjee sent an e-mail to Janie Olafson at 9:51 a.m. on December 10 requesting her to begin drawing up documents reflecting his agreements with Patel. Olafson was a real estate professional Banerjee had retained to draft a full lease and sale agreement for the property and business. The e-mail mentioned Patel's asserted promise to secure his monthly payments with the equity in his home.

signed copy from the premises, because Banerjee never found it. Patel denied ever discussing or agreeing to the mortgage payment increase.

On the afternoon of December 10, Banerjee called Patel from Janie Olafson's office. According to Banerjee, he read to Patel the provisions she had drafted for monthly mortgage payments of $13,500 and the use of his house as collateral in case of default on future payments, and asked him if he was okay with them or wanted to add anything. Patel told Banerjee he would not put anything in writing, and would not "sign anything with my house as a collateral." Banerjee testified he was shocked and felt betrayed that after Patel had asked him for more time to pay, he would change his mind and refuse to put his house down as security. Patel testified Banerjee called him that afternoon to demand he come up with $100,000 as a deposit, apparently because the bank was assertedly requiring a $100,000 principal repayment as a condition of the loan modification. Banerjee denied making any such demand and testified the bank had asked him only for repayment of an arrearage of $23,610.

Banerjee returned to the Purple Orchid that evening and spoke briefly with Patel. They agreed Patel would meet or speak with Banerjee's wife the next day. He had known her longer than her husband. Banerjee's wife testified Patel called her the next morning as Banerjee was on his way to the Purple Orchid. Patel asked Mrs. Banerjee to talk to her husband and get him to back off from making him sign a contract "because we are like family and we will never hurt you." Mrs. Banerjee refused, and told Patel she thought "the contract [was] the right way to go." Patel told her this was the end of their friendship and hung up. Patel denied the subject of having a signed contract ever came up in his telephone conversation with Mrs. Banerjee.

When Banerjee arrived at the Purple Orchid on December 11, he took possession of the credit card machine. Patel called the sheriff to report Banerjee had stolen the machine, but the sheriff took no action. Patel stayed for a couple more hours and then left, advising the staff he would not be back the next day. He did not return to the Purple Orchid after December 11, and did not make the $18,000 payment he agreed to make on December 20.

7

Banerjee resumed operation of the business and continued to manage it until July 2011, when he entered into an agreement with third parties to sell the business and lease the property to them with an option to purchase. The buyers made a $50,000 downpayment, and made deposits totaling $60,000 of their own money into a working capital account. The option price for purchasing the property was $4.8 million. The transaction was memorialized in both a preliminary letter of intent and final 24-page signed contract.

Patel filed this action on December 17, 2010. His first amended complaint asserted causes of action for specific performance, breach of contract, and injunctive and declaratory relief. The trial court found there was no meeting of the minds on essential terms and no enforceable contract. In the alternative, assuming for purposes of analysis Exhibit 9 was a contract, the court also found Patel did not sustain his burden of proving breach of contract or damages, and was not entitled to specific performance. Patel timely appealed from the judgment in favor of Arkesh.

## II.  DISCUSSION

Patel contends the parties' execution of Exhibit 9 created a binding and enforceable contract, and all of the court's rulings concerning it were erroneous or unsupported by the evidence.

### A.  *Applicable Law*

We begin with the applicable standard of review. " '[W]hether a certain or undisputed state of facts establishes a contract is one of law for the court . . . [.] On the other hand, where the existence . . . of a contract . . . is the point in issue, and the evidence is conflicting or admits of more than one inference, it is for the . . . trier of the facts to determine whether the contract did in fact exist . . . .' " (*Robinson & Wilson, Inc. v. Stone* (1973) 35 Cal.App.3d 396, 407.)

Mutual consent is an essential element of any contract. (*Weddington Productions, Inc. v. Flick* (1998) 60 Cal.App.4th 793, 811 (*Weddington*).) Consent is "not mutual, unless the parties all agree upon the same thing in the same sense." (Civ. Code, § 1580.)

8

" 'The existence of mutual consent is determined by objective rather than subjective criteria, the test being what the outward manifestations of consent would lead a reasonable person to believe.' [Citation.] . . . The parties' outward manifestations must show that the parties all agreed 'upon the same thing in the same sense.' [Citation.] If there is no evidence establishing a manifestation of assent to the 'same thing' by both parties, then there is no mutual consent to contract and no contract formation." (*Weddington*, at p. 811.)

Because the facts surrounding the parties' execution of Exhibit 9—the objective manifestations of their intentions—are disputed, we apply the substantial evidence standard of review to the question of whether they agreed upon " 'the same thing in the same sense.' "

## B. *Enforceable Agreement or Agreement to Agree?*

"[W]here it is part of the understanding between the parties that the terms of their contract are to be reduced to writing and signed by the parties, the assent to its terms must be evidenced in the manner agreed upon or it does not become a binding or completed contract." (*Beck v. American Health Group Internat., Inc.* (1989) 211 Cal.App.3d 1555, 1562.) In our view, substantial evidence supports the trial court's finding that the parties intended Exhibit 9 as "a letter of intent, rather than a [binding] contract."

The very first sentence of Exhibit 9 signals that the document was really no more than a memorialization of preliminary deal points rather than a final, binding contract: "This is to signify *my intention to purchase* the real estate and business operation of the Purple Orchid . . . ." (Italics added.) The document also states: "The purchase *will be structured* as a lease with option to purchase . . . ." (Italics added.) Further, Patel would have to have known from the very brevity of the document and the nature of the transaction—less than half a typed page governing the lease and sale of a 20-acre property and business operation—that a further writing would have to be prepared and agreed to by the parties. Exhibit 9 leaves up in the air a multitude of issues that would normally be addressed in a written contract for a transaction of this nature. A partial list would include which party would be responsible for property taxes during the term of the

lease; how the option to purchase would be exercised; Banerjee's rights in the event of a default in payment by Patel; Patel's rights in the event of a default in payment of the mortgage or a decision by him not to exercise the option to purchase; Banerjee's right to encumber the property; Patel's rights to change the Purple Orchid's business operations or make improvements or alterations to the real property during the lease period; Banerjee's right of access to the property; the parties' responsibilities regarding maintaining and paying for adequate property and liability insurance; the parties' relative responsibilities for capital expenses such as major repairs and regulatory compliance costs; the parties' respective rights and responsibilities inter se (e.g., indemnity, defense) in the event of a lawsuit or liability arising from the hotel's operations, or damage to the property due to fire or other event; and rights pertaining to subleasing, assignment, and successors in interest.

In addition to the text of Exhibit 9 and its obviously skeletal form, there is substantial extrinsic evidence both parties understood and intended it as a provisional document that would be subject to the bank's final decision about a loan modification, as well as the negotiation and execution of a complete purchase and sale agreement for the property and the business. Although Patel testified Banerjee told him the bank had approved modifying the loan to limit monthly payments to $12,000, Banerjee testified he kept Patel informed of his loan modification negotiations with the bank, and of the fact that he was *trying* to negotiate a figure of $12,000 per month. He testified Patel knew from their discussions the final number for Patel's monthly mortgage payments would not be "nailed down" until Banerjee got a number from the bank. Banerjee further testified he and Patel discussed the bank's loan modification offer the morning of December 10, and Patel agreed to pay the $13,500 per month the bank wanted. He sent two e-mails to Patel that morning referencing the $13,500 figure. One of the e-mails stated that Banerjee was instructing the "Folks" who were "drafting the Agreement" to include the $13,500 figure. There was no evidence Patel ever sent a reply questioning or objecting to the statements made in either e-mail. Moreover, Banerjee would never have guaranteed to Patel that his monthly mortgage expense would be $12,000 before he had a

10

figure nailed down with the bank. As discussed earlier, Exhibit 9 stated Patel "assumes *all* the business and financial responsibility of operating the Purple Orchid Inn." (Italics added.) Nothing in Exhibit 9 or elsewhere in the record suggests Banerjee agreed to partially subsidize one of those expenses—the bank's financing charges—out of his own pocket if the amount he could negotiate exceeded $12,000 per month. Such an exposure would have made little sense for someone hoping to get out of the business.

Banerjee also testified he told Patel Exhibit 9 was a working document between them until they could get a real estate person to draft the lease agreement and have a lawyer review it. Banerjee's testimony on this subject is substantiated by the fact that Patel failed to reply with objections when Banerjee sent him e-mails on the morning of December 10 indicating he was having a new agreement drawn up with terms different from and in addition to those contained in Exhibit 9.

Notwithstanding conflicting evidence in the record, we find substantial evidence supports the trial court's determination that the parties intended Exhibit 9 as a nonbinding letter of intent rather than a binding contract.

## C. *Breach of Contract*

Even assuming for the sake of analysis that Exhibit 9 is construed as a binding contract, substantial evidence also supports the trial court's finding that Patel materially breached it by failing to make the first two payments required under its terms. If so, Banerjee was relieved of further performance and Patel's causes of action for specific performance, damages, and injunctive relief were properly rejected. (See *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277.) Whether Patel materially breached the contract is a factual issue subject to the substantial evidence standard of review. (*Ibid.*)

There is no dispute that Patel failed to tender $12,000 to Banerjee on December 8, and another $12,000 on December 10, 2010, as called for in Exhibit 9. According to Banerjee, he agreed to allow Patel to cure his default by making full payment of the amounts due by December 20, but *only* if Patel agreed to make the equity in his home available as collateral in the event of a future default. While Patel at first agreed to this according to Banerjee, he ultimately refused to "sign anything with [his] house as a

11

collateral." The trial court was entitled to accept Banerjee's testimony on this point and reject Patel's conflicting testimony that Banerjee readily agreed to postpone payment of the amounts due until December 20 without asking any questions or attaching any conditions. In any event, Patel defaulted on his promise to pay $18,000 on December 20 as well.

In our view, Patel's failure to acquire any short-term working capital to run the business, his defaults in making the first two payments that came due, and the repudiation of his initial agreement to furnish security against future defaults—all of which were shown by substantial evidence—excused Banerjee from further performance and justified him in abandoning the contract, assuming one existed. (*Brown v. Grimes*, *supra*, 192 Cal.App.4th at p. 277.) Under these circumstances, Patel could not obtain specific performance of the asserted contract or damages for its breach.

## III. DISPOSITION

The judgment is affirmed.[3]

---

[3] We deny Arkesh's motion for sanctions on appeal.

_____
Margulies, J.

We concur:


_____
Humes, P.J.


_____
Banke, J.